## Clark's Administratrix, et al. v. Callahan.

(Decided November 19, 1926.)

### Appeal from Jackson Circuit Court.

1. Trial.—Credibility of witnesses' testimony is for jury.
2. Wills—Verdict for Plaintiff, in Suit on Natural Father's Promise to Provide for Him from Estate, Held Warranted by Evidence.— Verdict for plaintiff, in suit on his natural father's promise to provide for him out of father's estate, in consideration of mother's agreement not to prosecute bastardy proceedings, held warranted by testimony of plaintiff's mother and grandmother as to relations between plaintiff's parents.
3. Wills.—Parol promise to make one an heir is not binding.
4. Contracts.—Contracts made in consideration of present or future illicit intercourse are not enforceable.
5. Wills.—Father's contract to provide for his illegitimate child out of estate, in consideration of mother's agreement not to prosecute bastardy proceedings, is valid and enforceable.
6. Judgment—Judgment of Dismissal Without Prejudice Cannot be Collaterally Attacked in Subsequent Suit on Same Cause of Action; Appeal Being Proper Remedy.—Judgment of court, having jurisdiction of parties and subject matter, dismissing suit without prejudice on plaintiff's motion, after stating that findings were adverse to plaintiff, cannot be collaterally attacked in subsequent suit on same cause of action; appeal being proper remedy.
7. Evidence.—Witness may testify as to what testator told draftsman to put in will, but not as to what paper itself contained.
8. Appeal and Error.—Alleged error in judgment, not pointed out to trial court, need not be considered on appeal.
9. Executors and Administrators—Wills—Judgment Against Administratrix and Legatees and Distributees Under Will for Breach of

Testator's Promise to Provide for Illegitimate Son Held Warranted (Civil Code of Practice, Section 434; Kentucky Statutes, Sections 2084, 2085).—Civil Code of Practice, section 434 (Kentucky Statutes, sections 2084, 2085), held to warrant judgment for illegitimate child against father's administratrix and legatees and distributees under his will, for breach of father's contract to provide for plaintiff out of estate.

10. Judgment—Entire Judgment Held Properly Adjudged Collectible from Any of Several Defendants Receiving More than Amount Thereof from Estate Liable.—In illegitimate child's suit against fathers administratrix and legatees and distributees under his will for breach of father's contract to provide for plaintiff out of estate, court properly adjudged that whole amount of judgment recovered could be collected from any of several defendants found to have received more than such amount from estate.

LEWIS, BEGLEY & LEWIS and W. E. BEGLEY for appellants.

A. W. BAKER and L. C. LITTLE for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER—Affirming.

The appellee, whom we shall refer to as the plaintiff, recovered a judgment for $5,000.00 against Demie Clark as administratrix of the estate of William H. Clark, and against her and other legatees of Clark, personally, which judgment she has superseded, and from it she prosecutes this appeal. This was an action at law and, among other things, in the petition it is stated that William H. Clark died on November 6, 1921, leaving a will in which he devised property to different parties, all of which is set out in great detail. All the beneficiaries under this will were made defendants. It is admitted by the defendants' that Clark's legitimate daughter, Maude Fowler, was willed $5,000.00 in money and a tract of land worth $2,000.00. This land she was to have during her life, and at her death it was to go to her children. It is also admitted that Rebecca McKinney was a concubine of Clark's and that there was devised to her $500.00 in money and a tract of land which is admitted to be worth $10,000.00. This land she was to have during her life, and at her death it was to go to her three children. The defendants admit that Demie Clark received, under this will, $67,000.00 in money and 18 tracts of land worth $10,400.00. The petition alleges that Maude Fowler is forty-one years of age, and in ordinary health, and Re-

becca McKinney is forty-nine years of age and in ordi-
nary health.

Plaintiff, in his petition, alleges that he is the natural
son of W. H. Clark; that he was born on Nov. 17, 1897;
that his mother, Martha Callahan, was then an unmarried
woman; that after his birth and while he was yet less
than three years of age, his mother instituted bastardy
proceedings against W. H. Clark, and that within a few
days thereafter, W. H. Clark entered into a verbal con-
tract with Martha Callahan, whereby Clark agreed with
her that if she would not prosecute him on this charge,
he would contribute liberally to the support and main-
tenance of this plaintiff during his infancy and that
he would, before his death, make suitable provision
for the plaintiff out of his estate, and would, prior to his
death, provide that this plaintiff should and would have
and receive an amount equal to a full heir's part of his
estate, as though this plaintiff were his lawful heir, and
should receive as much as his daughter, Maud, now Maud
Fowler.

This case has been well briefed, and we shall adopt
the classification made by the attorneys for the appellant
and shall discuss the questions raised in the same order
that they are discussed there. The first contention made
by the defendants is that the story told by the appellee's
mother and grandmother is not believable. One answer
to that is that the jury did believe it; but as they have
discussed this with such earnestness, we will consider
that statement briefly. The statement of Martha Calla-
han, when abbreviated and expurgated, is that she is the
fourth of five illegitimate children born to her mother;
that in the latter part of 1896 or early part of 1897, her
mother was living on Mr. Clark's farm about two and
one-half miles from his home in McKee; that Clark asked
her mother to allow Martha Callahan to come and live
with him and to help with the house work. Martha Calla-
han says that she was then fourteen years of age; that
she was illiterate, but a virgin; that Clark immediately
began to make improper proposals to her and prosecuted
them with such vigor that three days after her arrival
at his home, he had sexual intercourse with her; that
she lived at Clark's home and these illicit relations be-
tween her and Clark continued until the summer of 1897,

when her mother learned of the pregnancy of Martha
·Callahan, came and got her and took her home in order
to take care of her; that before and after the birth of the
plaintiff, Clark continued to visit her; that he fitted up a
room in the house occupied by her mother, and that Clark
·continued to visit her, Martha Callahan; that they oc-
·cupied this room, and their illicit relations continued;
that when this plaintiff was about fourteen months of
age, she instituted bastardy proceedings against Clark,
whereupon Clark came to the home of the plaintiff's
.grandmother, and upon learning that Martha Callahan
was at work at the home of Mr. Hoskins, sent for her;
that she came over, and that this conversation occurred:

"He asked me what made me law him. I told
him I swore the baby to him because he was the
father of it, and he had told me that he would make
the baby an heir with his child at home, and I swore
the baby to him because I knew that I never knew
anything about any other man, I wanted the baby
some day to know who its father was, so it could
heir its part of its father's estate, if I should have
died and left it while it was little. He told me that
if I would drop the suit, the bastard suit, and not go
on with it, that he would make my baby an heir with
his girl at home. So I dropped it and didn't do any
more about it. He stayed two days and nights with
me, and the baby when he come to make up the suit
with me. He took me and the baby to old Mason
Halcomb's and bought us shoes, flannel clothes for
the baby. When he went to leave us he give the
baby a ten dollar bill in his hand."

She says that on account of that, and relying on that,
she dropped the bastardy proceedings. She says Clark
provided her with money and clothes for the plaintiff,
.and she had everything she wanted to eat or wear. She
says that Clark always called her "Scrub," and that
while she lived at Clark's home she slept with Clark in
his own room, and that this and their illicit practices were
known to Mrs. Clark. This is the story that the ap-
·pellants contend is unbelievable. The proof shows that
Mrs. Clark was a lady of culture and refinement, and it is
.argued that she would not have tolerated the bestial lust
of her husband in the home. However, Mrs. Clark ad-
·mitted that James Campbell, who was reputed to be the

natural son of Clark (see Clark's Admrx. v. Campbell,
212 Ky. 341, 279 S. W. 327), had lived in the Clark home.
She admitted plaintiff had eaten at her home, and that
plaintiff's mother and grandmother lived on one of
Clark's farms.

Plaintiff's grandmother tells substantially the same
story as the plaintiff's mother, except, of course, the
nauseating details of what occurred at the Clark home,
but she substantiates the plaintiff's mother in the equally
nauseating details of the illicit relations between Clark
and the plaintiff's mother at the home of this grand-
mother. The statement of this mother and grandmother
is contradicted by the statement of Mrs. Clark and her
daughter. It is argued that this mother and grand-
mother trumped up this tale to mulct the estate of Clark,
but it could be just as well argued that the vigorous
denials made by Mrs. Clark and her daughter, Mrs.
Fowler, were prompted by a desire to defeat the plain-
tiff's claim, and to preserve this estate for themselves.
With two women of plebian blood testifying one way and
two of patrician caste testifying another, we turn to the
testimony of neighbors and acquaintances of Clark, and
it supports the statements made by the mother and
grandmother, that the mother, Martha Callahan, did
live at Clark's, and did give birth to the plaintiff. Several
witnesses testified to acknowledgments made by Clark
that plaintiff was his son.

The defendants sought to show by evidence, that
Martha Callahan and her mother were common prosti-
tutes, but, on the other hand, there was evidence for the
plaintiff that while the reputation of plaintiff's grand-
mother was bad, that the reputation of plaintiff's mother
was untarnished, except by her relations with Clark. It
was shown that Clark said of her that "she was a nice
girl and a damn good looker," that "she was a virgin
and he had treated her mighty bad," and the witnesses
said he related to them the circumstances under which
he accomplished her ruin, and it was too indecent
to relate. So, on the whole, the story of this mother and
grandmother, instead of being unbelievable, has, when it
is coupled with, and supported by, the testimony of these
neighbors, rather a convincing ring. The only way we
can account for the tolerance of Mr. Clark's lust by his
wife is that she had ceased to be his wife, except in name
only, and bore this situation in the hope that she might

persuade him to reform, and might preserve his estate for herself and her daughter.

The next contention of the defendants is that a parol promise to make one an heir is not binding, and that contracts made in consideration of present or future illicit intercourse are not enforceable. The defendants are correct in this position; but this is a suit upon a promise by a father to provide for his illegitimate child out of his estate, in consideration of the mother's agreement not to prosecute bastardy proceedings begun against him. The father failed to make such provision, and by this action the plaintiff sought damages for such breach of this contract, and such a contract is valid and enforceable. See Clark's Admrs. v. Campbell, *supra.*

The next alleged error is the action of the trial court in sustaining a demurrer to the second paragraph of defendants' answer. By that paragraph the defendants had pleaded in great detail, that on July 17, 1922, this plaintiff began an action at law against these same defendants for the same thing sought here, which was transferred to equity, and prepared for trial, and that after a motion had been made to submit the case, the plaintiff entered a motion to dismiss his action without prejudice, which was done over the objection of the defendants; that after that was done, in the year 1923, this plaintiff began an action in equity against these same defendants, seeking this identical relief and upon this identical cause of action, and that after the proof had been taken, that by agreement of parties, the action was submitted, for final judgment upon the merits, the case was argued before the judge of the court by counsel for both parties, and that after the judge had indicated to counsel for plaintiff that for certain reasons, his finding would be adverse to the plaintiff, the plaintiff entered a motion to dismiss that action without prejudice, to which motion these defendants objected, but the court overruled their objections, permitted that action to be dismissed without prejudice, and entered an order to that effect. The defendants by this paragraph of answer insist that it was too late for the plaintiff to dismiss his cause of action without prejudice after it had been submitted to the judge for decision, and at a time when the judge had so far carried his consideration of it that he had stated his findings would be adverse to the plaintiff, and the de-

fendants sought by this paragraph of answer to plead
such former actions and hearings in bar of the plaintiff's
action in this case.   It is not necessary for us to decide
that question for that court then had jurisdiction of these
parties, and of the subject matter, and the disposition
of this case then made is a judgment of that court which
can not be attacked collaterally.   The defendants, if dis-
satisfied with the action of the court in dismissing that
case without prejudice, should have pursued the course
adopted in the cases of I. C. R. R. Co. v. Siebold, 160 Ky.
139, 169 S. W. 610; Ohio Valley Electric Co. v. Lowe, 167
Ky. 132, 180 S. W. 61. The defendants should have ap-
pealed from that judgment.   Then we would have had
that question directly before us, and would have been in
a position to say whether or not it was erroneous.   As
it is, it might be conceded for the sake of argument that
it was too late to dismiss this case after it had gone as
far as it had, and still, no court can consider a collateral
attack upon the judgment of the court in so dismissing it.

   That brings us to his next contention, which is that
the instructions are erroneous.   We have carefully ex-
amined these instructions, and the criticism of them made
by the defendants.   We have reached the conclusion that
they correctly submitted to the jury the issues made by
the pleadings.

   The next alleged error complained of by the defend-
ants is that J. W. Markham was allowed to testify about
the provisions made for the plaintiff in a will which it
was claimed W. H. Clark had prepared in Louisville at
a time when he had been taken suddenly ill in that city.
Defendants insist that as this will was a written instru-
ment and there was no showing that it had been de-
stroyed or lost, this writing itself was the best evidence
of what it contained.   The defendants are correct in
that, but that part of Markham's evidence was excluded
from the jury.   No part of Markham's evidence about
what was in the will was read to the jury.   All of
Markman's testimony that was admitted was his testi-
mony relative to Clark's statement to the draftsman of
what he wanted put in the will.   Markham's testimony
about what Clark said he wanted put in the will was com-
petent, but Markham should not have been allowed and
was not allowed to testify about what the paper itself
finally contained.

The next contention is that the verdict of the jury is against the weight of the evidence, and what we have said above about the testimony of the plaintiff's mother and grandmother is a complete answer to this.

Defendants alleged that this judgment entered upon the verdict of the jury is erroneous:

"It is therefore adjudged by the court that the plaintiff Bradley Clark Callahan recover from the defendants herein to-wit: Demie Clark as administratrix of the estate of W. H. Clark deceased and from defendant Demie Clark individually, Maud Fowler, Rebecca McKinney, Robert Clark McKinney, and Bradley Clark McKinney the sum of five thousand dollars with six per cent interest from the date of the entering of this judgment until paid, and their costs herein expended with these provisions and directions, the whole of this judgment may be collected from the defendant Demie Clark, either as administratrix of W. H. Clark deceased, or individually and the whole of same may be collected from defendant Maud Fowler and the whole of this judgment may be collected from the defendant Rebecca McKinney, and one thousand and eight hundred and twenty-five dollars of this judgment may be collected from the defendant Robert Clark McKinney, and no more, and one thousand eight hundred and twenty-five dollars of this judgment may be collected from defendant Bradley Clark McKinney and no more, and if this judgment or any part of same is collected by execution, the clerk of this court will before delivering such execution to the sheriff, make a notation of said execution stating that not more than said amounts can be collected from defendants Robert Clark McKinney, and Bradley Clark McKinney, and if this judgment is not paid execution may issue thereon to all of the foregoing judgment the defendants, and each of them, object and except."

One answer to this contention is that the defendants did not then offer to point out to the trial court any errors in this judgment. The plaintiff began this action under section 434 of the Civil Code, against Mrs. Clark as administratrix, against her individually as a legatee, and against the other defendants as legatees and distributees,

under the will of W. H. Clark. This action and this judgment were fully warranted not only by this section of the Code, but by these sections of the statutes:

"2084. A devisee shall be liable for all debts and liabilities of the testator in the same manner as the heir of the testator would have been liable if the property devised had descended to the heir."

"2085. The same actions which lie against the personal representative may be brought jointly against him and the heir or devisee of the decedent, or both, and shall not be delayed for the non-age of any of the parties."

We have called attention in the early part of this opinion to the admitted age of Rebecca McKinney, and to the admitted value of the property devised to her, and there was before the court abundant data from which to estimate the value of the property received by Rebecca McKinney, and each of her children from this estate. The court properly concluded that all of these defendants, except the McKinney children, had received more than $5,000.00 each from this estate, and therefore properly adjudged that the whole of this judgment could be collected from any one of them. As to the McKinney children, the court estimated the value of what was devised to each of them, and fixed it at $1,825.00, and properly limited the amount of this judgment that could be collected from each of these McKinney children at that sum.

The judgment is affirmed.