## Mayfield v. Cupp et al.

(Decided Nov. 14, 1933.)

MURRAY L. BROWN and ROY W. HOUSE for appellant.

RAY C. LEWIS for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—
Affirming.

In his petition, John Mayfield averred that he is the illegitimate son of Howard Cupp, Sr., and Nancy Mayfield, and claimed damages equal to the entire estate of Cupp under an agreement made in 1875, in which he promised the plaintiff's mother that, in consideration of the dismissal of bastardy proceedings, which she had instituted against him in the Clay county court, he would assist in supporting and educating plaintiff during his minority and would bequeath him all of his estate of every kind which he owned at the time of his death. Practically all of the allegations of the petition were denied. After pending upon the court's docket since August 15, 1919, a judgment was rendered October 10, 1930, dismissing the petition. An appeal is now prayed barely within the two years allowed by law.

We think it was established that the plaintiff is the son of the parties, who were never married; that the father was arrested upon a bastardy warrant, which was shortly thereafter dismissed; that Cupp recognized plaintiff as his child, and assisted in his support for a long time; that he did say upon several occasions that he intended to leave his estate to him, as he was his only heir. It was twenty years or more after plaintiff's birth before Cupp married. Then he married the widow of his brother, who had several children. Cupp died in May, 1919, and devised his estate to his widow and her children. He also provided: "I further will to an illegitimate boy, John Mayfield, $1 of my estate."

Nancy Mayfield died many years ago. Evidence as to her statements that there was an agreement, as claimed by the plaintiff, is not competent or controlling. There is some evidence of statements made by Cupp to the effect that he had agreed to take care of Nancy as long as she lived and to care for the child, and that he would be a lawful heir, and the only one, as he was the only child he had. On the contrary, it was proven by

witnesses, who testified to having a clear memory of the transactions and conversations had forty-five years or more before, that Cupp had settled the matter by paying Nancy $75, a part of which was by an order upon a store for merchandise.

The memory of these witnesses upon both sides, if their testimony is accepted at face value, was extraordinarily keen. The evidence was perhaps colored by their attitude respecting the parties and the suit. Thus an eighty-five year old lady, after having been presented with a bottle of medicine by an attorney then in the case, repeated verbatim a conversation between Cupp and Nancy which occurred at 12 o'clock on a certain day when they came to her house on the way home from town. She testified that Nancy asked him, "What are you gwine to give John?" to which he answered, "Narry a cent, only $1." Placing the responsibility for the disclosure upon counsel for asking her, the witness deposed concerning Nancy:

"Q. What kind of a woman was she? A. I hate to tell you. Q. Why? A. Just because. Q. Do you mean to say she was not a good woman? A. Yes, sir, she was a bad character, just like everybody. Q. Do you mean that everybody has a bad character? A. Just like all other women. Q. Do you mean that all women are bad women? A. Lots of bad women; I have drunk many a dram with Nance and seen her drunk; now you are making me do this. Q. Were you drunk too? A. No, sir, I did not get drunk, but I drunk whiskey. Q. You have never been married yourself, have you Aunt Tish? A. No, sir. Q. How many children did you raise? A. Three and never lawed a man over either one of them. Q. And you don't believe in that? A. No, sir. Q. And that is the reason you want the defendant to win? A. Yes, sir."

Refusing to answer further questions, the witness gives us this quaint philosophy: "Enough of anything is enough and too much spiles it."

The law recognizes the obligation of the father of a bastard both to the mother and to the child to maintain, or assist in maintaining, him. Hence the statute has given the mother the right, if she choose to exercise it, to compel the father by a summary mode to do so.

Statutes, sec. 167 et seq. Pointing out that the statute does not give the power to county courts to originate the proceedings or does not compel the mother to do so, it was reasoned, in an early opinion by Chief Justice Robertson, that agreements to contribute to the support of an illegitimate child in consideration that the mother will not enforce that obligation by proceedings under the law are not in disregard of any principle of morality or public policy and are valid. Burgen v. Straughan, 30 Ky. (7 J. J. Marsh.) 583. We quote further from that opinion:

"This statutory right is clearly a civil right, and the remedy prescribed, though anomalous, is a civil remedy. The proceeding is not in the nature of a criminal or public prosecution, for a public wrong; nor is there any thing in it that should be deemed penal; and consequently, there is nothing in the consideration of the note which can be deemed the compounding of a criminal prosecution or of a penal action; nor can we perceive how it can be unlawful or immoral, or inconsistent with the policy of the law, for the mother of a bastard to agree with the father that, if he will co-operate in the maintenance of their child, she will not proceed under the bastardy act, to degrade and compel him, and thereby also expose herself to unnecessary humiliation. Such a contract is not incompatible with any civil or social duty. It should not be deemed injurious to the community or county. It is not the public duty of the mother of an illegitimate child to assert her statutory right. Her voluntary forbearance is no breach of any moral or civil obligation. Her child may become a burden to her county; but this might happen, and would, perhaps, be more likely to occur, if such contracts as that we are now considering should be declared illegal and void. Many, in her condition, might prefer all the wretchedness of destitution and poverty, to a voluntary promulgation, in a county court, of all the circumstances necessary to coerce contributions under the bastardy act."

See Steele v. Crawford, 197 Ky. 798, 248 S. W. 197; Clark's Adm'x v. Campbell, 212 Ky. 341, 279 S. W. 327; Smith v. Wagers' Administrators, 238 Ky. 609, 38 S. W. (2d) 685, and the cases reviewed therein.

But in Willoughby v. Motley, 83 Ky. 297, it is held that a contract to make an illegitimate child an heir cannot be specifically enforced, since compliance with the statutes respecting adoption is indispensable. It is to be noted, however, that the instant case does not attempt to enforce specific performance of the alleged agreement, but asks only for damages for breach of contract; the measure being the value of the estate. Such an action is authorized. Benge v. Hiatt's Adm'r, 82 Ky. 666, 56 Am. Rep. 912.

Although the petition states a cause of action, under the evidence the decision of the chancellor could not have been otherwise. Agreements of this kind ought to be established by clear and convincing proof before they can be enforced, and the evidence falls far short of being such.

It is argued, however, that the court may not consider evidence of the defendants that the agreement between the parties was that Cupp would pay, and did pay, the mother $75 and assist her in supporting their child, because no such contract was set up in the pleadings. The answer was merely a traverse. There was not much difference between the contentions as to what the contract was except as to devising the child the father's entire estate. Counsel seem to misconstrue the law in respect to the pleadings. This is not a case where it was sought to enforce a contract not pleaded, but simply to negative the contract claimed by the other side by showing that there was another one or one which did not go quite as far as the other party claimed. West v. Butler's Ex'r, 248 Ky. 404, 58 S. W. (2d) 662.

The judgment is affirmed.