## Hehr's Adm'r et al. v. Hehr.

Dec. 9, 1941.

582

Swinford & Sims, C. M. Jewett, Sawyer Smith and Raymond Connell for appellant.

John M. Keith and Bradley & Bradley for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—
Affirming.

The appellee, Bessie Marie Hehr, has succeeded in her suit against the personal representatives and heirs of John Hehr to recover damages for breach of a written contract made for her behalf by the deceased with her mother in which he agreed, in consideration of her mother not instituting bastardy proceedings against him, that he would support and educate her, the child, and would make her "his sole heir upon his death." It was stipulated that the net estate is $65,000, and judgment was rendered for the plaintiff for that sum.

It is conceded that the plaintiff is Hehr's illegitimate child, born May 28, 1916. The grounds upon which a reversal of the judgment is sought are: (1) The court should have held that the alleged contract to make the

plaintiff the deceased's sole heir is against public policy and, therefore, unenforceable; (2) insufficiency of evidence to establish a contract; and (3) the admission of incompetent evidence.

1. The appellants recognize the validity, as consistent with public policy, of an agreement of a putative father with the mother of his illegitimate child that he shall receive the share of a child or other heir in the distribution of the father's estate in consideration that the mother refrain from prosecuting a bastardy proceeding. Clarke v. McFarland's Executors, 5 Dana 45, 35 Ky. 45; Early v. Bradfield's Executrix, 266 Ky. 395, 99 S. W. (2d) 190. Intermediate of these cases are many others. See particularly Clark's Adm'x v. Callahan, 216 Ky. 674, 288 S. W. 301; Mayfield v. Cupp, 251 Ky. 328, 64 S. W. (2d) 884; Conley's Adm'r v. Hall, 261 Ky. 1, 86 S. W. (2d) 1015. But the appellants contend there is a distinction between the contracts in all those cases and a contract like the present one. The point is that the right to be an heir is a matter between the individual and the state and not a matter between two individuals, the legislature having absolute power to establish the right of succession and to say who shall inherit; that one may not under any circumstances bind himself to make any individual his *sole heir,* since that would be to deprive his wife or children, present or prospective, of their right to inherit his property as established by the Statutes; that one cannot thus bind himself to offend public policy as expressed in the statute. It is also submitted that public policy in respect to the adoption of a child would be violated; that every child in the state has a statutory right to be adopted as the child and heir of the promisor and such an agreement would destroy their right of adoption as well as the right of the promisor to adopt any child. The distinction in the cases in which the validity of such a contract has been sustained, it is claimed, is that the statutes of descent and distribution and of adoption were left effectual—only one other heir or child being added in the distribution.

A sufficient answer to this argument would seem to be to point to the right of every one to give away his property (the element of fraud being absent) and to bequeath the same by will, either disposition depriving a child, his own or another's, present or prospective, of the expected or potential right of inheritance. It seems

to us the same principle is involved whether the beneficiary of such a contract as we have here was promised all or only a part of the father's estate. Of like character is an agreement that one taking care of the promisor as long as he shall live shall receive all his estate as compensation. In either class of cases the recovery is not of the estate but damages for breach of contract, the measure of which is, ordinarily, the equivalent of the estate in money. Bowling v. Bowling's Adm'r, 222 Ky. 396, 300 S. W. 876; Jordan's Adm'x v. Burton, 281 Ky. 309, 135 S. W. (2d) 684. Such measure of recovery for breach of contract is something of a legal fiction for it avoids the transfer or payment of the expressed consideration. When, for a legal consideration, one promises to make another his heir it is always regarded not as promising the impossible of establishing the tie of blood —that which makes one the heir of another—but it is regarded as the equivalent of promising that he shall receive a child's inheritable part of the promisor's estate. It is not construed that he shall be equal with the collateral heirs where there are no legitimate children. It is the equivalent of promising to devise all of his descendible estate to the child, and an action for damages lies for the breach.

Appellants rely upon Davis v. Jones, Adm'r, 94 Ky. 320, 22 S. W. 331, 42 Am. St. Rep. 360. In that case Jones agreed with the mother of an infant that if she would give him the custody, care and control of her child —not his own—he would support and educate her "and make her his heir at law so that she could inherit all of his estate." A short time later Jones died without having adopted the child and without making testamentary provision for her. We held a demurrer to the petition seeking to recover damages for breach of the contract to have been properly sustained because such a contract is void as against the policy of the law, since heirship is controlled by the law of descent, which has for its basis the degree of blood, and because the only authority existing in this state by which one person can make another not related to him his legal heir is the statute covering adoption. It may be observed in passing that that opinion is not in accord with the general weight of authority (Annotations, 15 A. L. R. 223), and we have at least one recent opinion holding the contrary. See Small's Adm'r v. Peters, 233 Ky. 576, 26 S. W. (2d) 491. The facts in Brewer v. Hieronymous, Ky., 41 S.

W. 310, are like those in Davis v. Jones' Adm'r, supra, and the ruling of that case was followed, although its strength was slightly sapped. The case was decided upon failure of proof. Neither case was decided upon the fact that the contract undertook to make the beneficiary his "sole heir." In any event, the distinction between Davis v. Jones and a case like that at the bar is that Jones was not the father of the child he promised "to make his heir," and the legislature has provided means for imposing upon the father of an illegitimate child the expense of maintaining him. This distinction was drawn in Lewis v. Creech's Adm'r, 162 Ky. 763, 173 S. W. 133, and Moore's Adm'r v. Wagers' Adm'r, 243 Ky. 351, 48 S. W. (2d) 15, which were suits for damages for breach of contract in all respects like that now before us. In Benge v. Hiatt's Adm'r, 82 Ky. 666, 56 Am. Rep. 912, we sustained a contract by which the father agreed to maintain his illegitimate child and give him a certain tract of land in consideration of his mother delivering him into the custody of the father. See also, for contracts quite similar to that in the present case, Mercer v. Mercer's Adm'r, 87 Ky. 30, 7 S. W. 401; Skinner v. Rasche, 165 Ky. 108, 176 S. W. 924; Mayfield v. Cupp, supra; Conley's Adm'r v. Hall, supra. Cases of this character are different. There is not only the compulsion of the statute to support an illegitimate child, but a natural and moral obligation on the part of the father regardless of the absence of wedlock, coupled with the demand of justice that the innocent child be protected. The danger of wrongfully imposing paternity upon a man and the rigor of the common law have from a very early date induced the enactment of statutes depriving a bastard of the right of inheritance from a putative father. But as an equitable supplement to the statute requiring him to support his child, where paternity is certain and there is an indication of a father that he wanted his child to be cared for out of his estate, or there is anything to seize upon as a consideration for his promise, the courts have strained to protect the rights of the child. See 7 Am. Jur., Bastards, Sections 74, 75; Annotations, 39 A. L. R. 434; Mercer v. Mercer's Adm'r, supra; Benge v. Hiatt's Adm'r, 82 Ky. 666, 56 Am. Rep. 912.

The common law was so rigorous that it regarded a child born out of wedlock as nullius filius—the son of no one, having no father and no mother—and ignored its

existence. Mercer v. Mercer's Adm'r, 87 Ky. 30, 7 S. W. 401; Doughty v. Engler, 112 Kan. 583, 211 P. 619, 30 A. L. R. 1065. The more humane attitude of the present age and sympathetic concept closer to the Christian ideal has led to an advancement in bestowing legal rights and remedies in the child's favor by statutory provisions for his maintenance by the father and inheritance from the mother and her kindred. Sections 174, 1397, Statutes. Therefore, no such tenuous theory and technical distinction as that proposed by the appellants ought to be recognized, namely, that the contract involved is repugnant to public policy.

John Hehr died a bachelor. It is not necessary that we should express an opinion as to what construction should be given a contract founded upon a good and sufficient consideration to make an illegitimate child a "sole heir" in respect to cutting off the rights of a widow or legitimate children from participation in the estate. In Winne v. Winne, 166 N. Y. 263, 59 N. E. 832, 82 Am. St. Rep. 647, specific performance of a contract was asked against the heirs and next of kin of a woman who had died intestate by one who had been given to her when he was an infant under an agreement that she would keep and maintain him as her own child and at her death "give him all her property and make him her sole heir." The promisor died twenty-eight years later without so providing. During all those years the beneficiary of the promise had occupied the relation of a child, discharging all the duties that a faithful son owes his parents. The validity of the contract was challenged as being impossible of performance and contrary to public policy. The court reviews a number of similar cases in that state and draws a distinction between them, particularly between Gall v. Gall, 64 Hun 600, 19 N. Y. S. 332, affirmed 138 N. Y. 675, 34 N. E. 515 (upon which appellants rely), in which specific performance was denied where the promisor had later married again and had issue, the second marriage being held fatal to the enforcement of the contract. In the Winne Case [166 N. Y. 263, 59 N. E. 835, 82 Am. St. Rep. 647], the contract was upheld and enforced, the court saying:

"The intestate had no children, and hence this agreement cannot be regarded as invalid upon any principle of public policy which might prevent the enforcement of an agreement which should result

in the exclusion of children from the estate of their parents.''

The same is true in this case. We think the demurrer to the petition was properly overruled.

2. The appellee is the daughter of Miss Ida Hendrixson, who testified that she had lived across the road from John Hehr and had known him for five years before beginning to ''go with him'' in 1908. She did not keep company with any one else. They had planned to marry on September 5, 1915. A day or so after that date, Hehr told her his brothers had threatened him and he could not marry her. She told him it was all right, and denies having threatened a breach of promise suit. When she realized she had conceived she talked to Hehr about her condition. After the child was born, May 28, 1916, he said he could not do anything about taking care of the child because his brothers would not let him. She told him she would see a lawyer. She did confer with Mr. Daniel Durbin, an attorney in Cynthiana, who advised her to institute bastardy proceedings. Afterward Hehr came to her home and promised that he would take care of the child and ''leave her every cent he had when he died.'' On August 17, 1916, she met him at her lawyer's office. Mr. Durbin informed Hehr that the witness was going to bring bastardy proceedings and he agreed that he would give her $1,000, maintain and educate his child, and make her his sole heir at his death if she would not do so. The attorney prepared the contract to that effect and each of the parties signed it. Miss Nettie Talbott, the lawyer's stenographer, witnessed their signatures. She was paid the $1,000 and the bastardy proceedings were never instituted. Hehr visited his child and gave her whatever she needed, whenever she needed it, and never refused her anything as long as his health permitted, which was up to about four years before his death when his ''mind got off.''

Miss Talbott has been dead for some time. Mr. Durbin testified to Miss Hendrixson having consulted him and as to his advice. Hehr talked with him several different times about the matter. He stated time and again that he was the father of the child and wanted to do what he could for her and that he wanted to marry the girl but his brothers threatened him ''and he didn't want to take the chances.'' The attorney prepared a

written contract and it was executed as described by Miss Hendrixson. He could not recall whether it provided that the child should receive "all or a part of it." Pressed for a more definite answer, the witness declined to say which it was, except "I think she was to have all of it." Hehr gave Durbin his check for $1,200, and he gave his own for $1,000 to Miss Hendrixson, retaining $200 as his fee. He exhibited the cancelled check to the jury.

Several of Hehr's friends and neighbors testified to his statements from time to time that the appellee was his child. We notice the evidence of those who related his reference to having provided for her. A merchant in Cynthiana testified that Hehr was a regular customer and had told him about his child. Further:

"He would drink some and he would cry around about her; and he said he would like to be a real father and bring her up so remarks would not be made about her; and he said, 'Well, By God, if I died tonight everything I got goes to her because I have it fixed.'"

This was about 1925. Mrs. Della Hendren had lived across the road from Hehr. She had some children and he played with them, one of whom was a girl about the same age as Bessie Hehr. He referred to his own daughter "and was proud of her and was not ashamed of her." He said he would have married Ida Hendrixson if it had not been for his brothers. On one occasion he told the witness that he had a contract with Bessie's mother to clothe and educate her, and "he said he was going to leave to her his estate when he died." Hehr built a house on one of his farms in 1922. She asked him why he was building such a nice house for a tenant, "and he said he expected some day for his daughter to be living in it." Another neighbor, William Long, testified to Hehr's statements as to being appellee's father. One day he told him he was taking some money to her. Sometime about December, 1918, or January, 1919, at a certain place, he told the witness he and his brother George were dividing their property. He asked him:

"Johnnie, what are you going to do with your property? You never spend anything and if I was in your place I would quit this hard work and get out

and have a good time, and he said 'it is all fixed where my property will go to.' "

John Sosby testified that at a certain place in 1916, "He said he had had some trouble but that he had signed an agreement to clothe this child, educate her and make her his heir at his death."

John Hehr left the following will dated June 28, 1920:

"I realize if it hadent been for my Bro. George, I wouldent be worth what I am today. So I want George's children, Edine, Sugar Boy, Aggie, Boogie and Adrian to have Sixty Thousand Dollars ($60,000) more than their part of the rest of my estate after death. Want each to give Mama at least one thousand dollars, if she is still living."

Two of his brother George's sons-in-law witnessed the will.

The evidence presented in defense was by one of Hehr's nephews, who testified that about 1920 or 1921 (when witness was about eighteen years old), when his uncle John came to his home to live, he had with him a contract with Ida Hendrixson and it was thereafter kept in his father's iron safe. The witness had read the contract and it stated that it was agreed that his uncle would pay Ida Hendrixson $1,000 and she would "release him of everything," and that was all there was to it. It was signed only by Miss Hendrixson. He had seen the contract a number of times but it had been lost and he did not know where it was at the time he testified.

Mr. M. C. Swinford, Sr., testified that he had been consulted by John Hehr in 1916. Both of his brothers had first talked with him about the matter. Then the three of them came to see him together and reported that Miss Hendrixson was threatening a breach of promise suit and they wanted to get it settled. He went out to see her. She was behind the counter of her father's store when he went in. She agreed to accept $1,000 in settlement, "but her father didn't agree to anything as he was mad." The thing that impressed Mr. Swinford most, he testified, was that the father "got to cursing" and he didn't stay long. This was August 12, 1916, five days before the contract sued on was prepared. Nothing was ever said about a bastardy proceeding. The witness related a conversation with Mr. Durbin on the street

after a claim under the contract had been filed with Hehr's administrator, in which he referred to the contract he had prepared which he said the contract called for the payment of $1,000 to Miss Hendrixson and Hehr's agreement to clothe, educate and help take care of the child. He further stated that something had been said at the time about leaving the child Hehr's estate at his death and he had advised them all that Hehr had better leave that out and make a will.

Miss Hendrixson denied having talked with Mr. Swinford.

We think this very full recitation meets the rule which requires clear and convincing evidence of the existence and contents of such a contract, and makes it manifest that the verdict for the plaintiff is supported by the evidence.

3. The last point is that all of the foregoing evidence respecting the contents of the contract was incompetent because (a) the plaintiff had not pleaded the loss of the alleged writing which formed the basis of the action, and (b) no predicate was first laid for the introduction of oral testimony concerning the lost contract.

(a) The first argument rests upon the terms of Section 7 of the Civil Code of Practice, which provides that an action may be brought upon a written obligation which is lost without fraud on the part of the plaintiff or those under whom he claims. It is submitted that the question was raised by the demurrer to the petition and by the motion for a directed verdict. The record does not disclose any indication the point was being relied on until the argument upon the motion for a peremptory instruction was being made. The objection to the competency of the testimony as to the existence of the contract was stated at the time to be that it related to a transaction with a deceased person. That fact did not render the evidence incompetent. Stowers v. Hollis, 83 Ky. 544. Whatever may be the proper interpretation of Section 7 of the Civil Code of Practice in relation to an action upon a contract of the character involved, and whatever may be the effect of a failure to have moved to have the writing filed under the terms of Section 120 of the Civil Code of Practice, as construed in Preston v. Roberts, 12 Bush 570, and White v. Williamsburg, 213 Ky. 90, 280 S. W. 486; or the effect of the failure to dis-

close this as a ground of objection to the introduction of secondary evidence (see Crawford v. Crawford, 222 Ky. 708, 2 S. W. (2d) 401), we think the matter is cleared up by the filing of an amended petition after the motion for a directed verdict on this ground was made. We do not think the court abused a discretion in permitting the plaintiff to file this amended petition. Section 134, Civil Code of Practice; Chesapeake & O. Ry. Co. v. Conley, 136 Ky. 601, 124 S. W. 861; Stephenson & Co. v. Bradbury, 198 Ky. 416, 248 S. W. 1055.

(b) The rule as to the admissibility of parol evidence concerning the contents of a writing is, generally speaking, that before such secondary evidence is admissible it must be satisfactorily shown that the instrument has been lost without the fault of the party desiring to prove the contents. Chilton's Adm'r v. Shelley, 243 Ky. 576, 49 S. W. (2d) 305. It is the better practice to offer the preliminary proof of the loss first. That was not done in this case. But the same witnesses during the course of their direct examination did testify to their inability to present the same and we think that the order of presentation of the testimony was a sufficient compliance with the rule of admissibility. 22 C. J. 1048. Miss Hendrixson testified there was only one copy of the contract made and she was very positive that she did not take it with her from her lawyer's office. She had thought it was left with him for safekeeping "until we got ready for it." She had never seen the contract since the day it was signed. When asked if she had searched for it, she replied: "What was the use to search when I didn't have it." Mr. Durbin testified that he gave John Hehr a copy of the contract and Miss Hendrixson one also. Hehr did not want his brothers to know anything about the contract. He is very positive that he did not keep Miss Hendrixson's copy. He had not looked for it in his safe, where he had a particular place for keeping papers belonging to his clients, for if it had been there he would have seen it. As we have stated, a nephew of the deceased testified that the contract which his uncle had had also been lost.

It is ordinarily said that to prove the loss of a writing it must be shown that a reasonable search for it was made in places where the paper was last known to have been or that inquiry had been made of the person last known to have had it in custody. Elkhorn Land &

Improvement Co. v. Wallace, 232 Ky. 741, 24 S. W. (2d) 560. But the circumstances of the situation of the parties and of the disappearance of the instrument may be sufficient to prove its loss. Chilton's Adm'r v. Shelley, supra; Parsons & Scoville Co. v. Terrell, 228 Ky. 194, 14 S. W. (2d) 751. Mr. Wigmore says it is to be plainly understood "that there is not and cannot be any universal or fixed rule to test the sufficiency of the search for a document alleged to be lost." Continuing, he says:

> "This general principle of relativity, that the sufficiency of the search depends upon the circumstances of the case, is sometimes expressed in the form of a standard of diligence; the search, it is said, must appear to have been made with such diligence as was reasonable upon all the facts of the case in hand." Wigmore on Evidence, Section 1194.

We conclude the conditions surrounding the two witnesses, one or the other of whom had it in possession originally, twenty-four years ago, and all the circumstances were sufficient in the practical administration of the rule to establish loss of the contract. The evidence in this case is far different from that held in Suter v. Suter, 278 Ky. 403, 128 S. W. (2d) 704, not to be sufficient to establish the loss of a letter upon which the cause of action was primarily based.

Perceiving no error prejudicial to the rights of appellants, the judgment is affirmed.