# Boyers v. Boyers.

May 7, 1940.

W. B. Ardery, Judge.

**2**

R. W. Keenon for appellant.

Bradley & Bradley for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—
Reversing in part and affirming in part.

The paternity of a child, conceived during wedlock, though after separation, and born after divorce, is the primary problem presented. We consider appeals from two judgments.

After an acquaintance of a few days, Willis Boyers, then 29 years old, a resident of Scott County, married Lillian Terhune, then 17 years old, living in Mercer County. A child, Mary Eva, was born April 10, 1936. In September, 1937, the wife left the home in Scott County and filed a suit for divorce on the ground of cruel and inhuman treatment. She prayed for a judgment of alimony and custody of the little girl. The defendant denied the charges and claimed her custody. An interlocutory order was made allowing $40 a month to the wife and giving her the custody of the child. It was ordered that the father could see his child at the home of his relative, Mrs. O'Neal, in Harrodsburg, at reasonable times on request. On June 10, 1938, a divorce and custody of the little girl were granted the wife, with the same arrangement for visitation by the father and an allowance of the same sum for the child's maintenance. No alimony was adjudged. The former wife prosecutes an appeal from so much of the judgment as denies her alimony.

On December 30, 1938, the defendant filed a motion to have the case redocketed and asked that he be given the custody of the child and be relieved of the payment of the monthly allowance. He charged that another child had been born to his former wife on November 8, 1938, of which he was not the father. In response she charged that the defendant was the father of the child, and prayed that he be required to support her. Upon the evidence the court found the former husband not to be the father of the second child. Judgment was rendered taking the custody of the first child from her mother and awarding her to the father as long as he

shall reside in the home of his two aunts in Scott County. The allowance for the maintenance of the child was discontinued.

Upon abundant evidence, we think the court rightly adjudged the wife entitled to a divorce on the ground of cruel treatment. We do not understand why alimony was not allowed. She has no estate whatever while her husband is a substantial farmer, owning about 140 acres of land well-stocked and possessing nearly $1,000 in cash. He is worth at least $15,000. In such a situation alimony should follow as a matter of law. Collins v. Collins, 279 Ky. 139, 130 S. W. (2d) 37.

The second child was of normal development and, according to the laws of nature, was conceived during February, 1938, four months before the parties were divorced and while the wife was living at Harrodsburg and the husband in Scott County. Before stating and considering the evidence relating to the issue of the then husband being the child's father, it is well to examine the law in the light of which the evidence is to be viewed and by which it is to be weighed.

The maxim, brought from the Roman law into the common law, pater est quem nuptiæ demonstrant—the marriage shows who is the father—was until the last century so strictly construed that a child born of a married woman was conclusively presumed legitimate unless the husband was shown to be unable of procreation or "not within the four seas." 7 Am. Jur., "Bastards," Sections 13, 14; 7 C. J. 941. The great dramatist had King John to apply the ancient rule with a homely illustration of an English judge. (Act 1, Scene 1). A jurist of that day pronounced this "a plain and sensible maxim, which is the corner-stone, the very foundation on which rests the whole fabric of human society." Another commended it as "a maxim recognized by all nations, which is the peace and tranquility of states and families." Schouler, Marriage, Divorce, Separation and Domestic Relations, Section 696. But the maxim also came in for criticisms. Thus, Montesquieu observed in alluding to it that, "The weakness of mankind makes it necessary for the laws to suppose them better than they really are." 7 Am. Jur., "Bastards," Section 14. That absurdly arbitrary rule has been relaxed more and more so that the presumption of

4

legitimacy of a child begotten in wedlock is rebuttable by practical methods and substantial evidence. Annotations, 7 A. L. R. 329. But throughout this development to the present day, the interests of society, expressed as public policy, the presumptions of virtuous conduct on the part of a wife, and the protection of an innocent child from the cloud of bastardy, demand perhaps the strongest sort of evidence required in the establishment of any legal right in order to overcome the presumption that a married man is the father of a child begotten or born to his wife during wedlock. The force of this rule is so positive that it is generally held by the courts that the testimony of neither the husband nor the wife is competent to prove illegitimacy of a child born in wedlock, particularly if access within a possible period of g~station be shown. 7 C. J. 944; Annotations, 60 A. L. R. 380; 68 A. L. R. 421; 89 A. L. R. 911; Goss v. Froman, 89 Ky. 318, 12 S. W. 387, 8 L. R. A. 102; Veron's Adm'r v. Veron, 228 Ky. 56, 14 S. W. (2d) 185. This reference is made not as a decision in this case, for the parties waived any incompetency of such evidence, but to emphasize the policy of the law and the burden that the husband must carry to disprove paternity. The separation or divorce of the husband and wife prior to the birth of a child does not destroy the presumption of its legitimacy if it was begotten before the divorce. 7 Am. Jur., "Bastards," Section 19; 7 C. J. 942. However, reason warrants a lessening of the presumption according to the relations of the parties and all the circumstances.

In Wilson v. Wilson, 174 Ky. 771, 193 S. W. 7, 11, a filiation proceeding, the rules were considered. As therein indicated, the proof, in respect of degree, is divisible into two classes. The quality of proof of lack of opportunity for access may be less than the quality of proof of nonintercourse where such opportunity is admitted or established. In this latter aspect the "presumption of legitimacy is so conclusive that nothing short of showing it to have been impossible for the child to be legitimate will suffice to destroy" it. See, also, Sergent v. North Cumberland Mfg. Co., 112 Ky. 888, 66 S. W. 1036; Vanover v. Steele, 173 Ky. 114, 190 S. W. 667. As a whole, the evidence must, therefore, be strong and satisfactory, clear of inconsistency, and produce the effect of removing the question of reasonable

doubt. The wisdom of the rule of reasonable doubt in the trial of a man charged with an offense against the criminal laws can never be disputed. It is a harsh rule of society which visits the sins of the parents upon the innocent offspring of an adulterous union by imposing a stigma which often results in ostracism, sometimes in abandonment by both parents, and always, by law, the denial of the right of inheritance from the father. Assuredly, then, to bastardize an innocent child, begotten in legal wedlock, ought to require not a less but a greater degree of proof than to convict a man of even a minor criminal offense. Veron's Adm'r v. Veron, supra.

With so heavy a burden resting upon the former husband in this case, the former wife could have rested her case after proving the birth of the child. But she went forward with the proof, and we shall follow the same course in presenting it here as it relates to the crucial circumstances.

After the separation in September, 1937, Mrs. Boyers lived in an apartment in Harrodsburg. She would take the little girl to Mrs. O'Neal's home and meet her husband. Mrs. O'Neal testified that she was disagreeable and unpleasant, displaying no sign of affection unless she was going to get some money. They always ate together at her table. She testified that Boyers tried to get his wife to become reconciled and return to him but she refused. He did this the last time they met at her house, which was in October, 1938, after the divorce had been granted and three weeks before the child was born. She would not agree to return unless he gave her half his property. On this point Boyers says he never tried to get her to go back to him after their divorce, and says that it was in December, 1937, that she agreed to come back for half his property. Said he, "I told her I didn't want a mistress; I wanted a wife; * * * I don't believe in paying a woman to live with me." According to Mrs. O'Neal he brought his wife a present nearly every time he came. She rejected one because her lawyer might object. He then offered to take her home but she would not go with him. She once threatened to have him arrested for reading some letters he had taken from her. Boyers disclosed that this occurred in March, 1938. The letters were from another woman living in Georgetown. He gave them back to his wife when she threatened to call the

sheriff. Mrs. O'Neal states that either she or one of Boyers' aunts was always present during the visit of the parties at her house. His aunts, with whom he lived, testified one or the other of them always went with him to Harrodsburg. They knew he did not go at other times because he had not changed clothing.

Though Boyers says his wife was unpleasant, his testimony does not indicate any unfriendliness. They kept up a correspondence and certain letters, to which we shall later refer, make it manifest they were on friendly terms during all the time. In September, 1938, she visited in the home of his aunts, in Scott County. A letter written on her return to Harrodsburg refers to their kindness and her pleasure. She wrote them that she and Willis had had a drive into the country before he put her on the bus. He denied on the trial that they did so. Concerning this general situation Mrs. Boyers deposed that often Mrs. O'Neal would be about the house and they were left alone. Her husband was always trying to get her to go upstairs to a bedroom or to go out with him, offering her money to do so, but she refused. Her threat to call the sheriff was not so much on account of the letters he had taken from her purse as it was because of his persistent advances. Except a general statement that he was never with his wife except in the presence of Mrs. O'Neal or one of his aunts, we have searched the record in vain for a contradiction of this evidence.

Such is the general background against which the more specific evidence is to be viewed.

Mrs. Boyers testified that on a Saturday in February, 1938, her husband came to her apartment. Mrs. O'Neal was away from home. He wanted her and the baby to go with him to Danville and they left about 11 o'clock. When they came back he stayed with her until around 4 o'clock. Her brother and his wife had been in her room that morning and her sister-in-law had come again in the afternoon while Boyers was there. During that afternoon, ''He wanted me to have intercourse all the time, and I knew I was getting a divorce and I didn't feel like I could, and he said if you don't I will stop your allowance; and first one thing and another, and he just simply forced me to have intercourse with him.'' Mrs. Boyers testified that she had not gone

with or had any illicit relations with any man and that this was the only time she had submitted to her husband. Cross-examination was not effective in weakening her testimony unless an inability to fix the exact date or to describe the kind of weather it was, or her admission that though forced to submit she had sounded no alarm be so regarded. The sister-in-law testified to having seen Boyers in the apartment that morning when his wife and little girl were getting ready to go to Danville with him. When she went back to the apartment that afternoon he was there. Mrs. Boyers looked like she had been crying, and after he had gone she told her what had happened. Incompetency of this testimony was waived. Perhaps of some value is a postal card included among letters Boyers introduced which is postmarked February 9th. On this his wife was asking him for some extra money as she and their baby had been sick and her rent was due. He was and is devoted to his little girl. It would have been natural to go to see her.

Two women in whose house Mrs. Boyers had had rooms, and another witness who also liveu in one of the houses, testified that she was devoted to her little girl, had always conducted herself properly as far as they knew, and had never gone out at any time with any man.

Boyers denied calling upon his wife or seeing her except at Mrs. O'Neal's home, and stated that he had seen her only once at her apartment during November, 1937, for about a minute, and again on March 21, 1938, when it was raining and he had called for her and the little girl. On each occasion, however, his aunt was with him. He specifically denied the circumstances related by Mrs. Boyers and insisted that he knew nothing about the second child until after she had been born. He had not been in Harrodsburg between December, 1937, and March 1, 1938. This was because his divorce suit was supposed to be coming up and he stayed away on advice of his lawyer.

Boyers kept a diary. He had entered the dates of his visits to Harrodsburg in it, but denied on suggestion of his attorney to let opposing counsel examine the book. One of his aunts, Miss Lucas, kept a diary. She made an entry every time he went to Harrodsburg and there is no such record during January or February.

There is an absence of any entry concerning the young man or what he was doing from February 2d to the 9th, although the diary purported to record what he did every day. Mrs. O'Neal kept a diary. She destroyed it, however, at the end of the year; but not until she had made a memorandum of the dates shown therein on which Boyers had met his wife at her house. She testified to those dates, and there is none during January or February. A comparison of the dates testified to by Boyers and those of Mrs. O'Neal reveal discrepancies. He shows that he was in Harrodsburg at her home on November 11 and 30, December 31, 1937, and March 1, 1938, and she does not. She shows that he was there May 18, July 3, and August 21, 1938, and he does not. The dates recorded in Miss Lucas' diary are not given. These records all but bear the imputation of proving too much. Certainly, the conflict in the dates recorded by two of the witnesses and the absence of disclosure of dates in the other, when each witness vouches for the accuracy of his or her entry, deprives the evidence of trustworthiness.

The defendant introduced several letters he received from his wife written both before and after the divorce was granted and before and after the second child was born. There is no intimation in any of those letters of the coming or of the existence of that child. Some of the letters are expressly addressed not only to Boyers but to his aunts, concern the health and little doings of their child, and are chatty in general. Mrs. Boyers insisted that she had written other letters to him in which she had referred to her condition, had shamed him and importuned him to help her, and these letters she insists should be produced. On December 2, 1938, she referred to an inquiry in a letter from him why he had not heard from her, saying, ''Why I have written you two letters since I heard from you. You surely didn't get them.'' Concerning the absence of any such reference from the letters presented, she testified: ''I didn't mention it because I knew it was needless and he didn't want me to. I didn't mention it at all because he didn't answer my letters and it was useless.'' She is in part corroborated by her sister-in-law who testified that she read one letter of that character. Another witness testified she mailed two letters for Mrs. Boyers addressed to her husband in August and November while

they were rooming at the same house. She remembers to have read one letter shaming him for trying to get possession of the little girl and for saying that he was not the father of the prospective child. On the other side, the aunt, who attended the mail box, testified she read all the letters from his wife and no others than those introduced were received. The absence of any reference to the situation in these letters is of undeniable significance. The fact that they were expressly addressed to the family, however, suggests an explanation for the omission in supplement of the excuse given by Mrs. Boyers.

Perhaps the strongest evidence weakening the wife's claim is another inference from her silence. Mrs. Boyers briefly testified orally before the court in June, 1938. She had given her deposition in September, 1937, a few days after the divorce suit was filed. Her testimony on that occasion related principally to her husband's visitation to their child and the money required for her maintenance. She stated that "He misbehaved very badly"; would get mad because he had to write a check; would curse and threaten to take the child away from her, and boasted of his influence. But she did not even intimate that he had assaulted her in the manner described or that she was four months with child. She admitted in testifying on the reopening of the case that she had never told her lawyer of the incident or of her condition. Her silence, when self-interest and protection demanded that she speak, rises up to refute her present story. Of that there can be no doubt. She excused her failure to disclose the situation by saying that her husband up to this time and later had repeatedly asked her not to do so, promising faithfully that he would take care of her and the expected child. He had suggested that it would prevent her getting the divorce which she wanted. She relied upon those promises. After she had disclosed her condition to her husband she says that he agreed to do anything for her if she would go back and live with him and that he would not do anything unless she did. He had renewed his promises on the occasion of her visit to his home in September, 1938. Mrs. O'Neal testified as we have related that he had tried to get his former wife to go back to him on their last visit to her home, which was October 21st, three weeks before the child was born. Her condition

must have been apparent. The continued friendliness of the couple, the apparent selfish nature of the man as disclosed by the entire record, together with due regard for the relative unsophistication of the twenty-year old girl, and all the circumstances surrounding her, tend to destroy the force of her failure to proclaim that her husband, to whom she was still lawfully bound, was the father of her coming child.

On the other side of the case is also an inference arising from silence which is the strongest circumstance supporting the wife's claim. More than anything else, we think, it destroys the husband's contentions. We have not only the presumption of morality and decency which the law throws about every woman, but proof of good behavior on the part of the wife. There is no sort of intimation that she had been guilty of lewd or lascivious conduct or had ever been out with or received the company of any other man, or that she bore other than a good reputation for morality and veracity. If she had conducted herself so as to give rise even to suspicion, we are sure able counsel for the husband would have produced some evidence of it. Obviously, the failure to do so was not to spare the woman, for the defendant had no scruples against branding the mother of his little girl as the mother of an adulterine.

There are two other items of evidence relied upon by the appellee which we regard as of little probative value. One is the testimony of his brother and aunt that his automobile did not run well or at all during February, 1938, because of some obstruction in the gas line. The other is the certificate of the doctor who attended the appellant, which left the name of the father of the child blank. The former evidence is too indefinite and unsubstantial, and the latter is explained by the fact that the certificate was not made out by the doctor himself, and that he did not ask nor did the mother say anything to him about who the father was. The doctor so testified.

The recitation of the evidence in so great detail has been in recognition of our duty to appraise the substantiality of the evidence and the circumstances and to decide so delicate a question. To impose a spurious offspring upon a man would be a grave error; but to impose mistakenly the brand of a bastard upon an inno-

cent child, with the consequences, would be a greater error and a tragedy indeed. The selfish nature of one or the other of these parties, which has caused him or her to conceal the truth so peculiarly within his or her possession, has imposed the responsibility upon the courts of endeavoring to ascertain the truth from a record of contradictions. We can only determine that by weighing the evidence in the scales provided by the law and testing it by the formulas established by the experience of the centuries. Doing so, we reach the conclusion that the appellee failed to sustain his charge of illegitimacy and, therefore, reverse the judgment of the trial court to the contrary. Gravely v. Gravely, 224 Ky. 640, 6 S. W. (2d) 1080; Wilson v. Wilson, 251 Ky. 522, 65 S. W. (2d) 694.

The first child seems to be well cared for in the home of appellee's aunts with whom he lives and provision is made for her mother to see her at reasonable times. The appellant and her family are poverty stricken. The trial court, of course, has authority to modify that part of the judgment at any time. To that extent the second judgment is affirmed.

The finding that the former husband is the father of the second child puts the duty upon him of supporting her. The first judgment should have awarded some alimony or maintenance to the wife. The two judgments are reversed to the extent that this was denied. Under the circumstances we think an allowance of $50 a month should be made the former wife for the maintenance of herself and child. Cf. Whaley v. Whaley, 280 Ky. 543, 133 S. W. (2d) 709. This, too, is open to modification upon a change in conditions.

Whole Court sitting, except Judge Rees, who is absent.