## Ratliff v. Ratliff.

Dec. 1, 1944.

716

O. T. Hinton for appellant.

V. R. Bentley and Sidney Trivette for appellee.

OPINION OF THE COURT BY JUDGE SIMS—Affirming.

Appellant, Homer Ratliff, as plaintiff below brought this action against Vivian Ratliff for divorce and asked custody of a son, Charles William Ratliff, born on Sept. 6, 1941. The petition charged defendant with adultery, with being pregnant by a man other than plaintiff, and with cruel and inhuman treatment. The answer is a traverse followed by a counterclaim averring abandonment and cruel and inhuman treatment on the part of the husband. She sought alimony in the sum of $5000 and $50 per month maintenance for herself and child and for her cost, including attorney's fee, but she did not ask for a divorce.

Before the case was submitted a second child was born to the wife on July 12, 1943. After much proof was taken, the chancellor entered judgment dismissing the petition, and on the counterclaim granted the wife an absolute divorce, $30 per month "in alimony for the maintenance of herself * * * and children * * * until further orders of the court," her costs, including an attorney's fee of $50, and gave her the custody of both children with the privilege of the plaintiff visiting them, or either of them, at reasonable times.

On this appeal plaintiff insists that the chancellor erroneously granted a divorce to the wife but should have granted it to him; that he should be given the custody of the older child and should not be required to pay any sum for the support of defendant and the younger child. Plaintiff admits in his brief that this court has no authority under KRS 21.060 to reverse the judgment

granting defendant a divorce and his request is that we reverse the judgment only insofar as it relates to alimony and the custody of the older child.

Practically all the evidence is directed to the question of whether or not plaintiff is the father of the child born July 12, 1943.

The parties were very young when they married on March 26, 1940, she being only 15 years of age and he but slightly older. He obtained employment in a defense plant in Norwood, Ohio, but his family remained in their home at Elkhorn City in Pike County, Ky. The night before leaving for the job on Sept. 18, 1942, he had sexual relations with his wife who was then menstruating. It is not denied that the contraceptive they used that night failed them and that both became apprehensive as neither wanted another child.

A letter from Ratliff to his wife dated Sept. 29th, made reference to this act of intercourse on the night of Sept. 17th and inquired, "Can you tell if you are pregnant? I sure hope not." Another letter from him on Oct. 24th, asked her, "Did you get sick this month, be sure and write me right back if you didn't. I hope you did." He came home to his wife about Nov. 3d, and remained with her two or three days. She returned with him to Cincinnati where she was with him several days, then returned to Kentucky for two or three days after which she joined her husband in Cincinnati, remaining with him until Dec. 8th. A letter from him on Dec. 28th, told her to see a doctor and advise him that she had menstruated and that he felt sure the doctor would not find her pregnant, as the only time they ever had any trouble with a contraceptive was on the night of Sept. 17th, but he wanted to hear from her on the subject as soon as possible. Another letter from him on Dec. 31st, admonished her not to postpone seeing the doctor and to inform him of the doctor's diagnosis "by the first of next week."·

Ratliff again wrote his wife on Jan. 8, 1943, to the effect that she had told him she was pregnant by him but he denied that he was the father of her expected child; that "you fixed the time so it would look like you got pregnant while you came down here with me in November, but you told me yourself that you wanted something to take to get rid of it, and that proves you knew

you were before you came down (here)." The letter then asked her to confess who was the father of the expected child and suggested that she have an abortion performed. In the last two paragraphs of the letter he said that he could prove in court that she had been out with other boys and that he would take Charles William from her.

Her testimony in substance was that she had been menstruating slightly since Sept. 18th, and while she thought she was pregnant she did not know it until December or January. She wrote her husband in January intimating that previously she had had an abortion performed (which is corroborated by the testimony of a doctor who subsequently treated her), and that she would not take a chance on another abortion; nor would she make a false confession and did not fear his threat to take her child.

In a Cincinnati rooming house on Feb. 17, 1943, she signed a confession reading: "I, Vivian Ratliff, confess to my husband, Homer Ratliff, that I had an intercourse with Herbert Gibson on Oct. 17, 1942, with which I became pregnant with child. (Signed) Vivian Ratliff." Ratliff testified that his wife had made this admission to him on the previous night for the first time, she having said the act occurred on the davenport in their home in Elkhorn City. He admitted that he promised her a large apartment if she would tell him the truth about her indiscretion and that she voluntarily signed the confession. Immediately after she signed it, he requested her to repeat the statement of her guilt before Mrs. Bill Owens, the woman who ran the rooming house. That she at first refused and then acknowledged her guilt before Mrs. Owens. He further testified that when he obtained the confession from her he was thinking about getting a divorce and had her repeat it in front of Mrs. Owens so he would have "some proof." However, Mrs. Owens did not testify, nor did Gibson.

Mrs. Ratliff's version of the confession is that she caused a warrant against her husband to be issued in Kentucky near the first of the year charging him with deserting a pregnant wife, and she first heard he was accusing Gibson of being the father of her unborn child soon after her husband returned to Cincinnati, following a trial on the warrant. She later joined her husband in Cincinnati and when she refused to confess that she

was guilty upon his promises to get an apartment and to be good to her, he threatened to kill her and Charles William and through fear and duress she signed the statement just as he dictated it. That she told him at the time it was not true and she also told Mrs. Owens it was false.

The proof shows that Herbert Gibson is a school boy living near Elkhorn City and that he had been to Mrs. Ratliff's home one night in October along with another boy and two other girls. The young people made candy, never separated while in her home that night and nothing improper took place. On another occasion she drove Gibson home, but there were two or three persons in the car with her. Willard Lyons, a truck driver who had spent some time in jail, testified that he saw Gibson's car parked near Mrs. Ratliff's home between 6 and 7 o'clock. But he did not see Gibson go in the house or Mrs. Ratliff come out, so his testimony amounts to nothing.

Mrs. Ratliff admits writing a note to Gibson, but says it was written at the request of and for Rushie Wallace. The paper inside the envelope was addressed to J. O. Johnson, a friend of the Wallace girl, to tell Johnson that Miss Wallace could not go to a show with him. It is true Marilene Wallace testified that she and Johnson read the note and that it was from Mrs. Ratliff to Gibson asking him to come to see her. Neither Johnson nor Rushie testified. This evidence is contradictory; but taking Marilene's version of this note as true, it does not even tend to show that Mrs. Ratliff had intimate relations with Gibson.

From the very first Ratliff was most apprehensive about his wife being pregnant. But it was not until she refused to submit to an abortion that he charged her with being pregnant by another man than himself and threatened to take from her by court proceedings their son. She testified she signed the confession only because he threatened to kill her and Charles William, telling him at the time it was untrue. He admitted he wanted the confession for use in this case which he instituted five days later. Under this record we are constrained to agree that the chancellor was correct in holding the confession was obtained by duress and it is entitled to no weight.

The baby born on July 12, 1943, was a normal child with no unusual circumstances connected with its birth. In testifying for plaintiff, Drs. F. H. Hodges and M. D. Flanary stated that the average time a woman carries a child is 280 days after conception and "if she apparently goes over time, it is due to a mistake in calculation based on error in the date of conception." Dr. Hodges was of the opinion that it was rare, if ever, that conception occurs during menstruation. Dr. Flanary did not think impregnation could occur during the menstrual period. Both of these doctors were of the opinion that if Mrs. Ratliff conceived on Sept. 17, 1942, her baby would not have been born on July 12, 1943, but that the delivery would have been around June 24th; while if she conceived on Oct. 17th, the delivery would have been around July 24, said Dr. Flanary, and around July 17th, said Dr. Hodges. Dr. Flanary testified that if Mrs. Ratliff conceived on Sept. 17th, she carried the child 18 days over time; if she conceived on Oct. 17th, she carried it from 12 to 15 days under time. Dr. Hodges expressed the same opinion, saying that a normal birth can occur any time after 7 months, and as from Oct. 17th, to July 12th, is 265 days, he thinks the baby was begotten on Oct. 17th.

Dr. A. G. Osborne, testifying for defendant, stated that pregnancy varies from 220 to 330 days as shown by recognized medical authorities. He said that while it would be unusual it was entirely possible and probable for Mrs. Ratliff to have conceived on Sept. 17th, and be delivered on July 12th. He further testified that some women menstruate three or four months after becoming pregnant and some during their entire pregnancy.

Counsel for plaintiff seem to have not considered that the husband had access to the wife on Nov. 3d, and made reference in one of his letters that the only time they had experienced a defect in a contraceptive was on the night of Sept. 17th. If the wife conceived on Nov. 3d, this child was just 26 days premature; while if she conceived on Oct. 17th (as her husband contends), it was 12 or 15 days premature. On the other hand, if this child was conceived on Sept. 17th, it was carried but 18 days over time, which is not so unusual. There is an English case (Gaskill v. Gaskill, [1921] L. R. Prob. 425, 21 A. L. R. 1451) where the wife carried a child 331 days while her husband was oversea. There, Vis-

count Birkenhead, L. C., held that the husband was not entitled to a divorce on the ground of adultery as medical science shows pregnancy may last that long. We will not let the slight discrepancy in dates shown in this paragraph bastardize this child, since medical science shows that the duration of pregnancy may vary more than from 26 days prematurity to 18 days over time.

So far as we recall, neither party testified whether or not they had intercourse when they were together several days around Nov. 3rd, but certainly there was every opportunity for them to have had. The rule is that where there is opportunity for access it will be presumed that a child born in wedlock is legitimate, and the presumption is so great it cannot be overcome except by evidence of the strongest character, and so convincing as to remove the question of a reasonable doubt. Boyers v. Boyers, 283 Ky. 1, 140 S. W. 2d 646, 648. As was written in the Boyers opinion, to bastardize such a child requires a higher degree of proof than is required to convict a person of even a minor criminal offense. See Wilson v. Wilson, 174 Ky. 771, 193 S. W. 7, for a full discussion of the presumption of legitimacy where the husband had access, or an opportunity for access, to the wife, and the character of evidence necessary to overcome that presumption.

When the evidence shown in this record is measured by this rule it is apparent it does not overcome the presumption of legitimacy. The chancellor so held and it is our opinion that his judgment is correct.

This record contains 214 pages for which the clerk taxed a fee of $64.20. More than half of it is composed of carbon copies which are blurred and trying on the eyes to read. This violates rule 3, subsection 2, of this court and the clerk will have $15 deducted from his fee and the same will be refunded to plaintiff. The trial court will cause this refund to be made by proper order upon filing of the mandate.

The judgment is affirmed.

Whole Court sitting.