## Moore v. Moore.

Nov. 20, 1945.

W. R. Henry for appellant.

Stephens & Steely for appellee.

OPINION OF THE COURT BY JUDGE CAMMACK—Affirming in part, reversing in part.

Roy Moore instituted this action in the latter part of August, 1944, to obtain a divorce from his wife, Flossie Moore, and to have the child born to Mrs. Moore on August 6, 1944, adjudged not to be his. In her answer and counterclaim Mrs. Moore sought to have Roy's petition dismissed, and to obtain alimony for the support of herself and her child. The trial resulted in the granting of an absolute divorce to Roy and the refusal of any allowance for the support of Mrs. Moore and the child. It was further adjudged that the child was not Roy's. Mrs. Moore is insisting that the chancellor improperly awarded a divorce to her husband, declared her child to be a bastard, and denied her an allowance for the support of herself and her child.

The parties were married the latter part of July, 1943. They lived together in the home of Roy's parents until September 12th, at which time Mrs. Moore went to her home. Her explanation of why she left was that she and her husband had agreed that he go away and get a job and provide a home for her, which he failed to do. According to Mrs. Moore's proof, she returned to Roy's home on the 18th and 19th of October, 1943. She said he was not there on the 18th, but he was there on the afternoon of the 19th, and that while there they had sexual intercourse. She said they went to the home of Roy's sister late in the afternoon of the 19th, and that she spent the night there, but Roy did not. In this statement she is supported by the testimony of Roy's sister. According to Roy's testimony, which is supported by that of his sister and other parties, Mrs. Moore went to his home on the 27th and 28th of September. Roy denied having sexual intercourse with his wife after she left the home of his parents on September 12th. Roy's sister said that while Mrs. Moore was at her home she told her that she was not pregnant. This Mrs. Moore denied. On the day set for Roy's trial the latter part of May, 1944, on an indictment which was returned against him in March, 1944, charging him with deserting his wife while she was in a pregnant condition, he agreed to pay her the sum of $10 a month and to pay the physician who was to attend her during her confinement the sum of $25. One or two $10 payments were made and the payment was made to the doctor. According to Roy's testimony and that of his father, Mrs. Moore's father, who was present when the aforementioned agreement was made,

told them that Mrs. Moore could not be present at the trial because she was expecting to be confined within a few days. As we have noted, the child was not born until August 6th. In November, 1943, Roy wrote to his wife and told her that he would not live with her any more, but that he was willing to help support her and her expected child. He admitted that they had frequently had sexual intercourse while they were living together. He takes the position now that, since the child was not born until August 6th, instead of during the early part of June, he was under the mistaken impression that the child was his. Therefore, he attempts to avoid the commitments in his letter and the agreement to pay $10 a month to his wife.

There is no testimony in the record showing any improper relations on the part of Mrs. Moore, though it was shown that she had a three year old illegitimate child when the parties were married. This Roy knew. Several neighbors testified that she had a good moral character. Her story as to the time and place she and her husband had sexual intercourse on October 19th raises some doubt as to its plausibility. Likewise, her testimony as to the manner in which she fixed the date of her visit to Roy's home sounds a little far-fetched, because she said that she wrote the date down in a little book and when she learned that Roy said the expected child was not his she marked the date on a calendar. Furthermore, there is no refutation of the testimony for Roy that Mrs. Moore's father told him the latter part of May that his daughter expected to be confined within a few days. However, she might well have thought that to be the case.

But the general rules of evidence do not apply in a case of this kind. As said in the recent case of Ratliff v. Ratliff, 298 Ky. 715, 183 S. W. 2d 949, the rule is that, where there is opportunity for access, it will be presumed that a child born in wedlock is legitimate, and the presumption is so great it can not be overcome except by evidence of the strongest character and so convincing as to remove the question of a reasonable doubt of its legitimacy. Furthermore, the bastardizing of a child requires a higher degree of proof than is required to convict a person of even a minor criminal offense. Several authorities are cited in the Ratliff case in support of these statements. A woman ordinarily carries a child

280 days after conception, but the medical testimony in the Ratliff case shows that the period of pregnancy sometimes varies from 220 to 330 days. The child born to Mrs. Moore on August 6, 1944, was born in lawful wedlock. That there was opportunity for access can not be questioned. We have noted that Mrs. Moore said she was with her husband on October 19th, while he said that he last saw her, except for an occasional meeting in Corbin, on September 28th. If her story is true, the child was born 290 days after conception. If his is true, it was born 309 days thereafter. Either date would fall within the period of possible pregnancy as recognized by medical authorities. Under the circumstances, we have reached the conclusion that the evidence in this case is not sufficient to warrant the bastardizing of the child. Furthermore, we think Roy was not entitled to a divorce, but we have no power to set aside that ruling. Therefore, we reverse the judgment, with the exception of the divorce phase thereof, with directions that the chancellor make an allowance for the support of Mrs. Moore and the child born to her on August 6, 1944.