Chief Justice Robfrtson
delivered the opinion of the Court.
“I promise to pay Ann Woodruff or 'her order, the just sum of twenty dollars Commonwealth’s paper, it being in consideration of her youngest son, which she says Jacob Straughn is the father of it — and in consideration of the same she receipts in full against the Commonwealth and all other charges — the tnonev to be paid by the first day of January, 1828. Given under my hand and seal this 3rd day of April, 1824.
“JACOB STRAUGI-IAN. Seal.
“Patsy Woodruff.”
Other notes of the same kind were executed at the same time.
Upon an appeal to the circuit court, from a judgment rendered on the foregoing note in favor of the plaintiff in error, as assignee of the obligee, the court, considering the .contract void on its face, would not permit the note to be read to the jury; and consequently, verdict and judgment were rendered in favor of Straughan. „
It may be admitted that the note discloses two considerations. And it cannot be denied that if either of those considerations be inconsistent with law, morality, or public, policy, the whole contract must he deemed vicious and void.
The first consideration, whether it be considered ■past cohabitation or the obligation to contribute to the support of the defendant’s own child, is unquestionably legal and valid. Although it is not easy to ascertain the precise nature and import of the last consideration, nevertheless it may be admitted to be *584 an agreement by the obligee not to proceed ao-ainsj: the obligor, under the bastardy act of 1795, for niaintainanee of her child, or to claim any other contribution from him as the putative father; and still it does not appear to us to be either immoral, illegal, or inconsistent with public policy.
Right oT file mother, tinder the act of 1795, to compel the father to maintain his bastard child is a clvil right, and remedy is a Prb'ceedhi^'^ is'noMn'na ture of a cri»rdu¡Zon>ublion for a piiblie wronep. Nor i<* there any thing: in the proceeding that should he deorned penal.
•-Agreementby mother of a “chihl, tiier, «hat if he %vill eon-tribute to the policy of the Isw. mainlninance of their child she will not proceed against him ■under the basiardy act, is «lot unlawful, immoral, ar inconsistent with the
The object of the statute of 1795, I Dig. 178, is to secure, in a summary mode, a natural right, and |0 enporce a na(llra] obligation. If the,father fail to maintain Ids bastard child, the burthen devolves on the mother. Pie is under an obligation, therefore, to both the mother and the child; and the act of 1798 has given her the right to compel jiim, if she choose to do so, to maintain, or assist her in maintain-their illegitimate offspring This statutory ing right is clearly a civil right, and the remedy prescribed, though anomalous, is a civil remedy. The Proceeding is not in the nature of a criminal or pub-lie prosecution, for a public wrong; nor is there any thing in it that should he deemed pencil: and cousequent!'/, there is nothing in the consideration of R)e note which can he deemed the compounding of a criminal prosecution or of a penal action? nor. can we perceive how it can he unlawful or immoral, or inconsistent with the policy of the law, for the mother of a bastard to agree with the father that, if he will co-operate in the maintainance of their child, she will not proceed under the bastardy act, degrade and compel him, and thereby also expose herself to unnecessary humiliation. Such a contract is not incompatible with any civil or social duty. It should not be deemed injurious to the community or county. It is not the public duty of the mother of an illegitimate child to assert her statutory right. Her voluntary • forbearance is no breach of any moral or civil obligation. Her child may become a burthen to her county; but this might happen, and would, perhaps, be more likely to occur, if such contracts as that we are now consider-, ing should he declared illegal and void. Many, in her condition, might prefer all the wretchedness of destitution and poverty, to a voluntary promulgation, in a county court, of all the circumstances necessary to coerce contributions under the bastardy *585 act. Have the countv courts power to originate an enquiry under that act, or to compel mothers of illegitimate children to do it? If they have, the agreement of the obligee in this case cannot impair that power or obstruct the effectual exertion of it; if they have no such power, then the obligee had a perfect right to make the contract which she did make. In that way.she may have effected an end, the accomplishment of which she never would have attempted in any other mode, and may thus have attained all the benefits secured to her by the statute.
Has county court or a°y of it® officers, ex officio, a under ],,v or™he°n statute of Eli-to in> stitutP compel the ° father of a ^ maintain'14 ¡t, if it would otherwise athe °0a¡^
Bastardy act of f,ne3 eoantv^conrt nor anv of its "ffiners a tuto any procppdir>¡is in rn-,:Hi;riin bis bustard rhiid, Hie '’^fjnaíine: ° «moi, pro-ped- ’’’ th<' fath of bastard nbild aerree bate to tho maintainance of the chil<f, and in con* siduration thereof the mother agrees not to prosecute him for its maintainance, under the act of 1795, the agreement will be enforced against him.
*585 it is not necessary to decide in this case, whether or not the agreement of the obligee would bar any proceeding which she might hereafter choose to instilute against the obligor, under the bastardv statute of 1795. It is not improper, however, to gest that, if she could still enforce that act, and should hereafter do so, she might be legally liable, to some extent, for a breach of her contract.
Nor is it properly within the range of this case, to enquire whether the county, or any of its officers, would have power, under the common law or the statute of Elizabeth, to institute any proceeding, ex officio, for compelling the defendant in error to maintain the child, if it be his, and would otherwise become a charge to the county; for no such power is given by the act of 1795, or was contemplated by it. And therefore, if the effect of the obligee’s agreement he that she would not proceed against the obligor under tiiat statute, which she might have enforced dr not, according to her own free will, she did nothing which she had riot a perfect legal right to do. If the defendant be compelled to pav her what he promised, who will be wronged? If she comply with her promise, who can sav she had not the Zeg«Zright to do so? What principle of morality—
what law — what public policy will have been di«regarded? None as we can perceive. The act of 1795 was intended to benefit her. It does not apply to those only who are poor; hut embraces the rich as well as the poor. It is not because the mother may be poor that the act of 1795 allows her to compel .the father, to contribute to the support of their spu.rious off-’nring; but it is because she should have the *586 right to coerce such contribution against the father, whether she be rich or poor. For his duty to maintain his own child does not depend on her inability to do it, but on the natural relation which he sustains to a helpless being whom he contributed to bring into the world. Such is the policy — such the effect of the statute of 1795.
Caperton, for plaintiff; Turner, for defendant.
Then, if the father of a bastard agree voluntarily to contribute, as he ought to do, to the maintainance of the child, provided'the mother will agree that she will not harrass and expose him under the act of 1795, the agreement should be enforced against him.
Wherefore, the bond does not seem to be void; and consequently, the judgment of the circuit court is reversed, and the cause remanded for a new trial,,