v.

Hon. Lisa O. BUSHELMAN, Judge,
Kenton Circuit Court, Appellee

and

C.H.E., Real Party in Interest.

No. 2010–SC–000045–MR.

Supreme Court of Kentucky.

May 19, 2011.

Roger Matthew Moore, Hornbeck & Moore, Covington, KY, Counsel for Appellant.

Hon. Lisa Osborne Bushelman, Kenton County Family Court Judge, Covington, KY, Counsel for Appellee.

Mary Erin Wilkins, Newport, KY, Counsel for Real Party in Interest.

Opinion of the Court by Justice VENTERS.

Appellant, J.A.S., is the mother of an infant child, N.R.S. She appeals as a matter of right from a decision of the Court of Appeals denying her petition for a writ of prohibition. She sought the writ to bar Appellee, Judge Lisa O. Bushelman, from proceeding with the adjudication of an action filed in the Kenton Family Court by Real Party In Interest, C.H.E., to determine the paternity of N.R.S. Appellant claimed the courts have subject matter jurisdiction in paternity cases only when a "child born out of wedlock" was involved and that N.R.S. is not a "child born out of wedlock" as defined in KRS 406.011. The Court of Appeals declined to grant Appellant's petition. It affirmed Judge Bushelman's conclusion of law that N.R.S. was born out of wedlock because Appellant's extra-marital affair with C.H.E. constituted a cessation of her marital relationship more than ten months before N.R.S.'s birth, and therefore under KRS 406.011 the trial court had subject matter jurisdiction.

In context of the familiar writ standards explained in *Hoskins v. Maricle*, 150 S.W.3d 1, 6 (Ky.2004), the question is whether the trial court has subject matter jurisdiction over a claim brought under KRS Chapter 406 to establish the paternity of a child born to a married woman and conceived while she maintained sexual relations with her husband. To address directly the basic procedural issue of whether Appellant met the writ standard, we once again confront the substantive questions of whether the paternity of a child born to a married woman may be challenged, and if so, by whom. The specific question posed in this appeal is whether the paternity of a child born to a married woman, who throughout the relevant time

period maintained a sexual relationship with her husband, may be adjudicated in Kentucky courts upon the petition of a man who, by the apparent results of a DNA test, is virtually certain to be the biological father of the child.

> It is to be regretted that questions like these should ever arise in the courts of this commonwealth. Kentucky's matrons are famed for their high sense of virtue and exemplary conduct; and it is to be regretted that the conduct of Mrs. Minnie R. Froman was so radical a departure from this fair fame as to impel us to declare her son, Soloman White Froman, illegitimate.

Thus spoke Kentucky's highest court in 1889, in the case of *Goss v. Froman*, 89 Ky. 318, 12 S.W. 387, 388 (1889), declaring that a child conceived by Minnie R. Froman during her marriage was illegitimate because it was not the child of her husband. The Court opined that "[t]he proof of the illegitimacy of the child, begotten in wedlock, is a direct attack upon the mother's virtue, and an accusation of a wanton violation of her wedding vows, and is a stigma upon the child, and taints its blood, if the charge be true." *Id.* at 390.

Much has changed since 1889, when paternity matters were known as "bastardy cases" and illegitimate children were denied a respectful place in decent society. Then, paternity litigation existed almost exclusively to enable a man (or his estate) to disavow an alleged paternal responsibility or to force him to accept paternal responsibility. Only in the last quarter of the twentieth century did we begin to see cases involving men seeking to acknowledge and accept a paternal obligation. Obviously, the stigma of being an "illegitimate" child or the parent of an "illegitimate child" is, within the greater part of society, gone. Some may lament the change as indicative of a decline in the moral fiber of American society. Others may celebrate the change for, among other things, its unbiased treatment of "illegitimate" children or the doors of opportunity it has opened for women, such as the destigmatization of bearing an out-of-wedlock child. But none may deny that the change has occurred. One thing has not changed: questions regarding the paternity of children born to married mothers still arise and must be resolved in the courts of this Commonwealth.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The preliminary facts are essentially uncontested. Appellant married R.S. on October 9, 1999. They have lived together ever since. They slept in the same bed, regularly engaged in sexual intercourse, and prior to 2008 had one child, whose paternity is not at issue. From August 2007 through the spring of 2008, Appellant was involved in an intimate and secret affair with Real Party In Interest, C.H.E., who was also married but was in the process of divorce. Appellant and C.H.E. had sexual intercourse on numerous occasions between October 2007 and March 2008. Throughout the affair, however, Appellant and her husband continued having sexual intercourse on a regular basis.

According to Appellant, the affair began because her marital relationship was troubled. She professed her love to C.H.E. and told him that she wanted to leave her marriage to be with him. He professed his love for her. She lied to her husband about her whereabouts when she was with C.H.E., and she lied about the reason his phone number often appeared on her phone bill.

In early 2008, Appellant discovered she was pregnant. By March of 2008, she decided to end the illicit affair, but admits that she did not clearly communicate that

to C.H.E. Instead, she continued to have frequent, non-sexual contact with him. She met some of his family members and kept him informed about her prenatal medical care. Appellant's husband remained unaware of the affair. He testified that had they not been having regular sexual intercourse, her pregnancy would have been a "huge problem" that he would have addressed immediately.

On September 8, 2008, Appellant gave birth in Kentucky to a baby girl, N.R.S. Two weeks later, she and C.H.E. arranged for a DNA test to determine if he was the father of N.R.S. The DNA test revealed a 99.9429% probability that C.H.E. was the baby's father. When C.H.E. expressed a desire to acknowledge his daughter and to be a part of her life, Appellant informed her husband of the affair.

On October 14, 2008, C.H.E. filed a paternity action in the Kenton Family Court pursuant to KRS Chapter 406. In response, Appellant denied that C.H.E. was the father of N.R.S. She also affirmatively pled that the court lacked subject matter jurisdiction and that C.H.E. had no standing to assert his paternity claim. Upon those grounds, she moved to dismiss the paternity action, relying exclusively upon the lead opinion in *J.N.R. v. O'Reilly*, 264 S.W.3d 587 (Ky.2008), which, under facts substantially similar to those before us now, posited the view that KRS Chapter 406 deprived Kentucky courts of subject matter jurisdiction to adjudicate a paternity issue involving a married woman whose child was conceived and born amid no cessation of her marital relationship.[1]

■ *J.N.R.* resulted in separate opinions by five of the seven justices on this Court. We refer to the opinion of Justice Minton (now Chief Justice Minton) as the "lead" opinion simply because it is first in line of the five opinions. While a majority of four justices concurred in the result reached by the lead opinion, they arrived at that result by at least two very different routes of legal analysis. None of the *J.N.R.* opinions garnered the support of more than two justices. Specifically, only one justice (Lambert) concurred with the rationale expressed in Justice Minton's lead opinion. *Ware v. Commonwealth*, 47 S.W.3d 333, 335 (Ky.2001) (quoting 20 Am. Jur.2d *Courts* § 159 (1995)), reminds us that "[a] minority opinion has no binding precedential value ... [and] if a majority of the court agreed on a decision in the case, but less than a majority could agree on the reasoning for that decision, the decision has no *stare decisis* effect." While *J.N.R.* provides five thoughtful and thought-provoking opinions, it offers no guiding principle or rationale supported by a majority of the Court, and therefore its use as an authoritative platform upon which to build a solid legal argument is completely undermined. While the persuasive influence of any of the *J.N.R.* opinions remains worthy of consideration, none should be cited as a holding of this Court. To the extent that *J.N.R.* is perceived or deemed to have binding precedential authority, it is overruled.

Judge Bushelman, guided by the *J.N.R.* opinions, concluded that the question of subject matter jurisdiction turned on whether evidence established that Appellant's "marital relationship" with her husband ceased ten months before the birth of N.R.S. Accordingly, an evidentiary hearing was conducted, and based largely on Appellant's testimony about her affair with C.H.E., the trial court found that "the

1. The lead opinion opined that KRS 406.180 limits the application of Kentucky's paternity statutes to "births out of wedlock" and that KRS 406.011 controls subject matter jurisdiction by defining "child born out of wedlock."

marital relationship," had ceased more than ten months prior to the baby's birth. Judge Bushelman essentially adopted the rationale of Justice Abramson's *J.N.R.* opinion,[2] that "marital relationship" as used in KRS 406.011 is not merely a synonym for sexual intercourse between a husband and wife, but is instead a collective reference to a monogamous relationship with traditional qualities, such as love, fidelity, and trust, to forge the marital bond between a husband and wife. In the trial court's view, the "marital relationship" ceased when Appellant broke the monogamous marital bond and began the intimate sexual and secret relationship. Upon that finding, the trial court concluded that it had subject matter jurisdiction because N.R.S. could be classified as a "child born out of wedlock" per KRS 406.011. Appellant filed an original action in the Court of Appeals for a writ of prohibition. The Court of Appeals agreed with the trial court and denied the writ. Although, we affirm the Court of Appeals decision, we do so upon different grounds.

As explained below, we reject Appellant's contention that KRS 406.011 defines the phrase "child born out of wedlock," and thereby controls the subject matter jurisdiction of paternity actions. Instead we conclude that its purpose is to codify the traditional presumption of paternity as it has developed throughout our jurisprudence. As further discussed below, we construe KRS 406.051, KRS 406.021, and KRS 406.180 as the statutes that govern subject matter jurisdiction and standing in paternity cases. In so doing, we recognize that the terms "child born out of wedlock," "bastard," and "illegitimate child" historically are used interchangeably to refer to a child whose mother, married or not, is not married to the child's biological father. We thus affirm the Court of Appeals be-

cause we conclude that the trial court had subject matter jurisdiction over this matter pursuant to KRS 406.051 and KRS 406.180 because the action is brought under KRS Chapter 406 to determine paternity of a child whose biological parents are allegedly not married to each other, and that C.H.E. has standing to assert his claim because he is a putative father authorized under KRS 406.021 to file a complaint to have paternity determined.

## II. KRS 406.011—OBLIGATIONS OF FATHER–PRESUMPTION OF PATERNITY

Prior to 1964, KRS Chapter 406, like its predecessor statutes, was known as the "Bastardy Act." In 1964, Kentucky adopted a version of the Uniform Act on Paternity, including KRS 406.011, which at the time read, "The father of a child which is or may be born out of wedlock is liable to the same extent as the father of a child born in wedlock, whether or not the child is born alive, for the reasonable expense of the mother's pregnancy and confinement and for the education, necessary support and funeral expenses of the child." It was codified under the heading "406.011—Obligations of father." In 1972, the General Assembly amended the statute by adding the second and third sentences, with the additional heading "presumption of paternity." Thus, in its current form, it reads:

406.011 Obligations of father-Presumption of paternity

The father of a child which is or may be born out of wedlock is liable to the same extent as the father of a child born in wedlock, whether or not the child is born alive, for the reasonable expense of the mother's pregnancy and confinement and for the education, necessary support and funeral expenses of the child. A

---

**2.** 264 S.W.3d at 601, in which Justice Schro-       der joined.

child born during lawful wedlock, or within ten (10) months thereafter, *is presumed* to be the child of the husband and wife. However, a child born out of wedlock *includes* a child born to a married woman by a man other than her husband where evidence shows that the marital relationship between the husband and wife ceased ten (10) months prior to the birth of the child.

(Emphasis added.)

The central premise of Appellant's argument is that the third sentence of KRS 406.011 defines "child born out of wedlock" to mean *exclusively* a child whose mother is unmarried or is a married woman whose marital relationship with her husband had ceased at least ten (10) months before the birth. Appellant further argues that since KRS 406.180 limits application of our paternity laws to "births out of wedlock," the Court has no jurisdiction to determine paternity of a child in all other circumstances. We do not agree that KRS 406.011 is the jurisdictional turnstile that limits access to court for paternity claims, or that it establishes the definition of

"child born out of wedlock." The statute does exactly what its heading portends: it abrogates the common law rule that a man has no legal obligation to support his illegitimate child and it codifies the traditional presumption of paternity.[3]

■ The first sentence of KRS 406.011 simply states the current manifestation of Kentucky's abrogation of the common law rule that a man has no legal obligation to support an illegitimate child, even if he is the child's father. The second and third sentences together articulate the common law presumption of paternity as it developed in Anglo–American and Kentucky law over centuries, which we discuss below in greater detail. KRS 406.011 determines not the cases over which our courts have subject matter jurisdiction, but the cases in which a man will be *presumed* to be the father of a child. It provides that the husband of a married woman is presumed to be the father of her child *only* if it was born while they were married or within ten months after the end of their "marital relationship."[4] It does not bar the claim

3. By this acknowledgment of the statute's heading, "Obligations of father-Presumption of paternity," we do not suggest that the heading constitutes any part of the law. KRS 446.140. The words of the statute speak for themselves.

4. Appellant argues that "the marital relationship" is synonymous with "martial relations," and that each phrase is a modest reference to sexual intercourse between husband and wife, echoing the definition of the term provided in the *J.N.R.* lead opinion. As noted previously, the trial court here opted for the broader understanding of "the marital relationship" described in the *J.N.R.* opinion of Justice Abramson. Given its context here, a more ambiguous term would be difficult to conceive. Standing alone, the term "the marital relationship" would seemingly mean the status of legal matrimony that begins upon marriage and ends upon death or divorce, analogous to "parent-child relationship" or "employment relationship." That

obvious definition is negated by the statute's implication that a married woman's "marital relationship" may cease even as her legal marriage continues. Given the many statutory references to sexual intercourse, including anal and oral sex, expressed by the General Assembly with no prudish reserve, we do not perceive a legislative preference for avoiding the term "sexual intercourse" when sexual intercourse is meant. Under the opinion we render today, subject matter jurisdiction does not depend upon when or if "the marital relationship" ceased, regardless of how we define it. Because Appellant's writ action challenged the trial court's ruling that it had jurisdiction to hear C.H.E.'s claim, and we agree that it did, we decline to choose a definition for "marital relationship." Instead, we will await legislative clarification or a case in which circumstances compel us to so decide. Whether the presumption of paternity applies in this case will, indeed, depend upon whether and when "the marital

that a man other than her husband may actually be the father. It simply provides that one challenging the legitimacy of a child born to a married mother within ten months after the cessation of her "marital relationship" cannot prevail without proof sufficient to overcome the presumption of paternity. Correspondingly, one asserting or defending the husband's paternity of a child born in those same circumstances proceeds with the presumption in her, or his, favor. Where the child was born outside of the ten month period or under other circumstances, there is no "presumed" father and the presumption of paternity does not apply. KRS 406.011 does not bar the right of an eligible party to have paternity legally determined. It determines only whether or not the burden of proof in a paternity case will be influenced by the presumption of paternity.

Appellant also contends that the third sentence of KRS 406.011 provides the exclusive definition of the phrase "child born out of wedlock." Its first word, "however," is a conjunction that syntactically links it to the preceding sentence, and together the two sentences articulate the traditional presumption of paternity. The sentence, therefore, does not stand alone and can be properly understood only in context with the whole statute. The use of the word "includes" in the phrase "a child born out of wedlock *includes* " plainly denotes that the following phrase is not an exhaustive recitation of what is meant by "child born out of wedlock."[5] *See*

*Cornelison v. Commonwealth,* 990 S.W.2d 609, 610 (Ky.1999) ("[U]se of the word 'including' leaves no doubt that the list is illustrative rather than exhaustive.") The sentence unambiguously indicates the legislative intention that cessation of the marital relationship more than ten months prior to the child's birth is but one means, *not the only means,* by which a married woman's child may be deemed to have been "born out of wedlock" and thereby denied the presumption of paternity. Our confidence in this construction of the statute is further enhanced by the phrase in the third sentence, *"where evidence shows "* which necessarily implies an adjudication of the matter in a court with subject matter jurisdiction.

Appellant's interpretation of the statute as a jurisdictional barrier would significantly alter the historic presumption of paternity by making it irrebuttable. Under that view, whenever the presumption arose its effect would be conclusive. It would not be a "presumption of paternity"; it would be a "conclusion of paternity." Appellant's interpretation contains another radical departure from the law relating to paternity matters. Under Appellant's view, and the *J.N.R.* lead opinion, a married woman such as Appellant (or the married mother in *J.N.R.*), who had sex with her husband within ten months prior to the child's birth, could not establish or enforce the child support obligation of the biological father of her child, even if she had divorced her husband or he divorced

relationship" ceased, but the application of the presumption is an evidentiary issue not before us in this writ action. It is one which may, and should, await appeal from a final judgment when the facts can be readily ascertained from a complete record.

**5.** Historically, the phrase "child born out of wedlock" is not a term of art, and seems to have come into common usage as a more acceptable modern substitute for "bastard,"

which over the years acquired the baggage of unrelated connotations. "Child born out of wedlock," like the word "bastard" has been used interchangeably with the term "illegitimate child." As shown below in Part V of this opinion, all three terms have been used historically to refer to a child whose biological parents were not married to each other, as well as a child whose mother was unmarried.

her. Likewise, despite hundreds of years of Anglo–American law to the contrary, a husband who had sex with his adulterous wife within ten months of her illegitimate child's birth, would be barred from challenging his alleged paternity because no court would have subject matter jurisdiction to declare that the child born to his wife was not his. He would be permanently bound to support the child of his wife's paramour. Meanwhile, the paramour could completely evade his financial responsibility because, again under Appellant's argument, no court in Kentucky would have subject matter jurisdiction to adjudicate the paternity claim against him. KRS 406.011 does not state that "the husband" is obligated to support the child; it states rather clearly that "the father" is obliged to support the child. In appropriate circumstances, which include the instant action, a paternity action under KRS Chapter 406 is the means by which we determine who is the father.

The *J.N.R.* lead opinion, upon which Appellant rests her case, earned the support of only two justices. Neither of the other the two justices [6] who concurred in result with the lead opinion accepted the notion that KRS 406.011 established a jurisdictional barrier against the adjudication of a paternity claim involving a child born to a married woman whose marital relationship had not ended. Both of the concurring justices agreed, as we hold today, that our statutes allow a paternity claim involving a child born to a married woman of an intact marriage, although they would hold that only the husband or the wife would have standing to initiate such a claim.

We close the discussion of this point by noting again that an opinion of this Court based upon Appellant's construction of KRS 406.011 would render irrebuttable the traditional presumption of paternity and would excuse a man from his paternal obligation simply because his lover remained married to her husband. It is incompatible with the express statement of KRS 406.011 that the *father* of the child is obligated to support it, and it represents such a radical departure from traditional Kentucky jurisprudence established in numerous decisions prior to *J.N.R.* that we respectfully decline the opportunity to adopt it. Some twenty-five years ago, we observed in *Bartlett v. Commonwealth ex. rel. Calloway*, 705 S.W.2d 470 (Ky.1986), that KRS 406.011 is our codification of the traditional presumption of paternity. We confirm that conclusion today. To further support our conclusion, in the following section, we detail the development of that presumption as it relates to the current version of KRS 406.011.

## III. KENTUCKY'S PRESUMPTION OF PATERNITY

### A. Origin and Purpose

To see how KRS 406.011 comfortably conforms to the traditional presumption of paternity, it is necessary to fully understand the presumption. We begin with a review of its historical development.

With antecedents in Roman law,[7] English common law developed and transplanted to America what we refer to as the "presumption of legitimacy" or the "presumption of paternity."[8] At common law,

---

**6.** Justice Cunningham and Justice Scott; *J.N.R.*, 264 S.W.3d at 596.

**7.** "The maxim [was] brought from the Roman law into the common law, *pater est quem nuptiæae demonstrant*—the marriage shows

who is the father...." *See Boyers v. Boyers*, 283 Ky. 1, 140 S.W.2d 646, 648 (1940).

**8.** Generally, the term "presumption of paternity" was used more often in cases relating to the obligations of a husband to financially

a man had no legal obligation to any child born to a woman who was not his wife, and no obligation to any child that was not biologically his. "[B]y the common law there was no legal liability upon the part of the father to support his bastard child. But in most, if not all civilized countries, he can now, at the instance of the mother, be made to do so, under the statute, by what is known as a 'bastardy proceeding'...." *Stowers v. Hollis,* 83 Ky. 544, 7 Ky.L.Rptr. 544, 549 (Ky.1886).[9] The common law also provided that an illegitimate child had no right of inheritance. *Scroggin v. Allan,* 32 Ky. (2 Dana) 363, 364 (1834) ("As by the rules of the common law, a bastard had no inheritable blood, and could neither receive from, nor transmit an inheritance to, his father, mother, brothers or sisters...."); *Sutton v. Sutton,* 87 Ky. 216, 8 S.W. 337 (1888) ("At the common law a bastard is *nullius filius.* Blackstone says that he is of kin to no one, derives no inheritable blood from any one, and can therefore neither be heir to any one, or have heirs save of his own body.")

The danger of wrongfully imposing paternity upon a man and the rigid nature of the common law have from a very early date induced the enactment of statutes depriving an illegitimate child of the right of inheritance from a putative father. But as an equitable supplement to the statute requiring him to support his child, *where paternity is certain* and there is an indication of a father that he wanted his child to be cared for out of his estate, or there is anything to seize upon as a consideration for his promise, the courts have strained to protect the rights of the child.

*Hehr Adm'r v. Hehr,* 288 Ky. 580, 157 S.W.2d 111, 114–115 (1941) (emphasis added).

The presumption was applied for two principal reasons: to avoid the bastardization of a child by making it difficult for a husband to deny the legitimacy of a child born to his wife, thus preserving for the child a right to paternal support and inheritance; and to protect a man's estate (and the inheritance of his legitimate children) from claims of children born by women who were not his wife.[10] It has served for

---

support his wife's child, while "presumption of legitimacy" was used more often in cases relating to the right of a putative child to inherit from a man's estate. The terms are, however, conceptually identical.

**9.** Kentucky's first "bastardy" statute, Chapter CXC, November Session, 1795, IVth Year of the Commonwealth, I Dig. 178, was modeled upon English statutes. *See Commonwealth v. George Turner,* 34 Ky. 511 (1836). It granted to "any single woman, not being a slave, [who] hath been or shall be hereafter delivered of any bastard child" the right to financial support from the father of her child. *Schooler v. Commonwealth,* 16 Ky. 88 (1809); *Burgen v. Straughan,* 30 Ky. 583 (1832).

**10.** Appellant suggests that its purpose is to protect the sanctity of intact marriages from intruding interlopers, such as C.H.E. Although some recent decisions in other states have given that as the purpose for statutes preserving the presumption of paternity, we find no historical support for that rationale. We see no evidence in the historical development of the law in Kentucky that protection of marriage played any significant role in the application of the presumption. Concern for the decline of marriage and a sense of urgency for its protection are relatively recent phenomena, which we find to be unlikely sources of public policy behind a presumption with such an ancient heritage. Appellant suggests that her interpretation of KRS 406.011 reflects a legislative policy to protect "intact marriages" by denying subject matter jurisdiction, even in cases of adultery, to claims involving a married mother unless her sexual relationship with her husband had ceased. Upon closer look, however, one readily sees that the statutory interpretation offered by Appellant would do absolutely nothing to protect the "intact marriage" of an adulterous man who fathers a child by a woman other than his wife. We cannot believe that a legislature so highly motivated to protect intact

some twenty centuries, not simply for the personal financial and hereditary affairs of individuals, but in matters of such societal and international importance as monarchial succession, during ages with very limited ability to prove the issue with the degree of certainty required, given its social and legal importance. Specific attributes of the presumption as it developed in Kentucky law are described below.

## B. Kentucky's Presumption of Paternity is Rebuttable

■ The presumption begins with the simple proposition that a child born to a married woman is legitimate; that is, it presumes that the husband is the father. It is long established and well settled that the presumption of paternity is rebuttable. In *Goss*, 12 S.W. at 389, our predecessor court held, "We understand the law to be that where the husband and wife have opportunities of access [sexual intercourse], there arises a very strong presumption that they did have it; *but this presumption may be overcome by clear proof to the contrary*" (Emphasis added.) Our highest Court stated in *Tackett v. Tackett*, 508 S.W.2d 790, 791–792 (Ky.1974) (quoting *Tarter v. Medley*, 356 S.W.2d 255, 257 (Ky.1962)), that "[t]here is a presumption that the child belongs to a couple who are married at the time of its birth. (KRS 406.011). However, being merely a presumption, it is subject to be overcome by proof" and "[t]hough the presumption of paternity and legitimacy is one of the strongest known to the law, it is not conclusive but is rebuttable and may be overcome by factual evidence."

## C. Standard of Proof Required to Rebut the Presumption

■ "The rule is that where there is opportunity for access [sexual intercourse of the wife with the husband] it will be presumed that a child born in wedlock is legitimate, and the presumption is so great it cannot be overcome *except by evidence of the strongest character, and so convincing as to remove the question of a reasonable doubt.*" *Ratliff v. Ratliff*, 298 Ky. 715, 183 S.W.2d 949, 952 (1944) (emphasis added). In *Boyers v. Boyers*, 283 Ky. 1, 140 S.W.2d 646, 648 (1940), our predecessor court noted that "until the last century [the presumption was] so strictly construed that a child born of a married woman was conclusively presumed legitimate *unless* the husband was shown to be unable to procreation or 'not within the four seas.'"[11] (Emphasis added.) *Wilson v. Wilson*, 174 Ky. 771, 193 S.W. 7 (1917), informs us further:

> [T]his ancient rule has been so far relaxed that in modern times this presumption may be overcome by showing that the husband had no opportunity for intercourse, and the jury, from all the facts, are to infer whether intercourse did, or did not, take place. 5 Cyc. 627. Under the majority of the cases, and which we think is the sounder rule, where access is either admitted or the opportunity for it is reasonably certain from the evidence, the presumption of legitimacy will prevail, unless the jury are convinced that it was impossible for the husband to have been the father of the child.

marriages from sexual interlopers would opt for a statute that protects the intact marriages of adulterous wives, but leaves the intact marriage of an adulterous husband vulnerable to intrusion by his interloping girlfriend.

11. The term "not within the four seas," a metaphor derived from England's maritime heritage, referred to a husband's prolonged absence from his wife which eliminated the possibility that he could have fathered her child. It is sometimes stated as "beyond the realm."

The most recent expressions of the standard of proof required to overcome the presumption of paternity indicate the appropriate standard is "proof beyond a reasonable doubt" or "beyond the realm of reasonable doubt." *See Simmons v. Simmons,* 479 S.W.2d 585, 587 (Ky.1972) (citing *Gross v. Gross,* 260 S.W.2d 655 (Ky. 1953)) ("The presumption that a child born in wedlock is legitimate is the strongest known to our law. Though rebuttable, it can be overcome only by evidence so clear, distinct and convincing as to remove the question from the realm of reasonable doubt.") *Bartlett,* 705 S.W.2d at 472, expresses the applicable standard as proof beyond a reasonable doubt.

### D. Ten Months—The Maximum Period of Gestation

Historically, a child would be denied the presumption of paternity, and hence the benefits of legitimacy, if it was established that the mother's husband had no access to her when the child was conceived. However, the time of conception could not always be determined with certainty. Some cases presented conflicting evidence on the question of the normal period of human gestation. For example, the Court in *Moore v. Moore,* 301 Ky. 14, 190 S.W.2d 689, 690 (1945) observed, "A woman ordinarily carries a child 280 days after conception, but the medical testimony in the *Ratliff*[12] case shows that the period of pregnancy sometimes varies from 220 to 330 days." In *Sergent v. North Cumberland Manufacturing Co.,* 112 Ky. 888, 66 S.W. 1036, 1037 (1902), ten months was considered a fair representation of the maximum term of normal gestation: "But

in every instance where it is allowed to be shown that the child born of a woman during wedlock, or thereafter within 10 months, is not legitimate, the burden of the proof is upon the one asserting the illegitimacy." KRS 406.011's codification of the presumption of paternity by the legislature virtually replicates the preceding expression of the common law presumption.

In 1972, the legislature settled any uncertainty about what period of gestation to use in determining when the presumption applied when it added the presumption of paternity to KRS 406.011 and designated the period to be ten months. Thus, a husband's paternity and the child's legitimacy will be *presumed,* albeit rebuttably presumed, in the case of a child born within ten months of the termination of the marriage or the cessation of the marital relationship. When the child is born beyond the ten month period, there is no applicable presumption regarding its paternity.

### E. Use of DNA Evidence to Overcome Presumption

Throughout the history of paternity adjudications, evidence sufficient to overcome the presumption of paternity or legitimacy has been limited only by the scope of biological knowledge available to prove or disprove a biological connection between a man and a child. Whatever evidence that could be adduced to prove or disprove that connection was admitted,[13] but until the twentieth century, biological sciences remained shrouded in mystery. Other than proof that the husband was long-separated

---

12. *Ratliff v. Ratliff,* 298 Ky. 715, 183 S.W.2d 949, 952 (1944).

13. We qualify the statement with the notable exception that testimony by a wife or husband as to their lack of sexual relations was not admissible to bastardize a child otherwise presumed to be legitimate. *Dudley's Adm'r et al. v. Fidelity & Deposit Co.,* 240 S.W.2d 76, 78 (Ky.1951); *Drake v. Drake,* 721 S.W.2d 728, 730 (Ky.App.1986).

from the wife, or proof that the husband was physically unable to procreate due to sterility or impotence, and such visible proof as a mixed-race child born to a woman of the same race as her husband, one could not before then conceive of any other kind of evidence capable of providing the degree of certainty needed to serve the societal policies implicit in the rule. Indeed, in former times, the most scientific method conceivable was to hold the child up before the jury for its consideration of whether it bore a physical resemblance to the putative father. Things have changed.

In *Simmons,* 479 S.W.2d at 587, our predecessor court held that the ability of "advanced technology used in blood-grouping test procedures interpreted in the light of genetic knowledge" to negate paternity with a high degree of certainty could be presented to overcome the presumption that the husband was the father of his wife's child. More recently in *Bartlett,* 705 S.W.2d at 472–473, we recognized that HLA blood testing,[14] along with other attendant circumstances, could supply the evidence "necessary to overcome the presumption of legitimacy and the requirement of proof beyond a reasonable doubt," noting further that "[w]hen the advances of science serve to assist in the discovery of the truth, the law must accommodate them." Scientific advances made since *Bartlett* enable even more accurate testing of genetic markers through DNA analysis.

In *Fugate v. Commonwealth,* 993 S.W.2d 931, 937 (Ky.1999), we recognized that the scientific reliability and validity of DNA testing had been generally established by the "overwhelming weight of medical and legal authority." DNA evidence is now used widely to prove beyond a reasonable doubt the guilt of those accused of crimes, and upon occasion, to exonerate innocent persons convicted of a crime. The General Assembly has expressed confidence in the ability of genetic testing to prove or disprove paternity by enacting KRS 406.111, which creates another presumption of paternity to apply when test results indicate probability of paternity of 99% or more. We see no justification for keeping the traditional presumption of paternity locked in the science of centuries past.

Appellant's written arguments to this Court make no mention of the apparent results of the DNA test conducted shortly after the child's birth. The test results may be for her an inconvenient fact, but they are so only because her husband chose to stay in the marriage. Had he chosen to do otherwise, those DNA test results might have been her only means to secure paternal support for her newborn baby. The current state of DNA testing is capable of determining paternity to such a degree of certainty that we no longer have to rely solely upon the husband's alleged impotence, his absence "beyond the four seas," or a visual examination of the baby to see if there are racial characteristics inconsistent with the husband. Just as those were once the only means of demonstrating beyond a reasonable doubt that the husband was not the father, DNA testing now serves as an appropriate form of evidence, not to avoid the traditional presumption of paternity, but to rebut it.

### F. Summary

From the foregoing review, we discern that the 1972 addition to KRS 406.011 comports well with the common law pre-

---

**14.** HLA blood testing is means paternity testing based upon human leukocyte antigens (HLA). Unlike the earlier blood type testing that could only rule out or negate paternity, HLA testing can yield positive results to affirmatively prove paternity to a relatively high degree of probability.

sumption of paternity, as it developed over centuries, and with which our courts have generations of experience. We read nothing in the language of KRS 406.011 or in the history of its application to persuade us that the General Assembly intended to depart from the traditional presumption. Fairly restated, the presumption as so codified provides that:

1. The husband of a mother is presumed to be the father of any child born to her during the marriage or born less than ten months after the termination of the marriage or the termination of "the marital relationship."

2. The presumption is rebuttable by any ordinary evidentiary means, but is overcome only by evidence so convincing as to remove the question from the realm of reasonable doubt.

3. There is no presumption of paternity or legitimacy with respect to a child born more than ten months after the termination of the mother's marriage or her "marital relationship."

## IV. JURISDICTION AND STANDING UNDER KRS CHAPTER 406

Having concluded that KRS 406.011 does *not* establish the subject matter jurisdiction for Kentucky courts in paternity actions by defining "child born out of wedlock," we look further into KRS Chapter 406 to see where it may vest subject matter jurisdiction, and where it may identify the individuals who have standing to establish the paternity of a child. KRS 406.051(1) assigns to the District Court[15] subject matter jurisdiction in two avenues

of cases: when "an action [is] brought under this chapter," and when "remedies for the enforcement of judgments for expenses of pregnancy and confinement for a wife or for education, necessary support, or funeral expenses for children born out of wedlock" are sought. The instant action is plainly *"brought under this chapter"* because it was brought to determine paternity according to KRS 406.021. It was not brought under the second avenue stated in KRS 406.051 for "remedies for the enforcement of judgments for expenses ... for children born out of wedlock" because there exists no such judgment to enforce. Consequently, in this case, the definition of "born out of wedlock" is immaterial to KRS 406.051's grant of subject matter jurisdiction to the District Court, and hence to the Family Court.

■ KRS 406.021 provides C.H.E. standing to petition to be declared the father of N.R.S. In *Sweat v. Turner*, 547 S.W.2d 435, 436 (Ky.1977),[16] we noted that, while KRS 406.021 allowed a mother access to the courts to pursue a paternity claim against the man she alleged to be her child's father, "[t]he statute does not afford the father the right to come into court to have his paternity determined." In response, the following year, 1978, the General Assembly amended KRS 406.021 by adding "putative father" to the list of persons with standing to file a complaint to have paternity legally determined.[17] KRS Chapter 406 does not define "putative father," but in ordinary English usage "puta-

---

15. By way of KRS 23A.100(2)(b) Family Courts, where established, assume the District Court's jurisdiction over actions brought under Chapter 406.

16. *Sweat* is not a case involving a child born to a married woman, and arose under a very different factual background.

17. The other persons identified in KRS 406.021 as entitled to bring a paternity action are the mother, the child, and the "person or agency substantially contributing to the support of the child" which would include the mother's husband if he was providing such support.

tive" means "commonly regarded as such; reputed." *Random House–Webster's College Dictionary* 1098 (1995). It is suggested, however, that C.H.E. cannot qualify as a "putative father" because *Black's Law Dictionary* (8th ed.2004) defines the term as "[t]he alleged biological father of a child born out of wedlock," [18] and N.R.S., if KRS 406.011 provides the controlling definition, is not a "child born out of wedlock." However, as noted previously, we reject the notion that KRS 406.011 was intended by the legislature to define "child born out of wedlock." Moreover, we note that the 1972 edition of the Black's Law Dictionary defines "putative father" as "the alleged or reputed father of *an illegitimate child.*" [19] We have found nothing to indicate that the legal concept of "putative father" has changed since 1972, and so we must conclude that only Black's preferred terminology changed; and that a "child born out of wedlock" is synonymous with "an illegitimate child." [20]

To resolve the question of whether C.H.E. is a "putative father" under KRS 406.021, we delve further into the relevant terminology.[21] The question of what is a "child born out of wedlock" arises in connection with our consideration of KRS 406.180:

KRS 406.180. Applicability.

This chapter applies to all cases of birth out of wedlock:

(1) Where birth occurs within this state;

(2) When birth occurs out of this state at the time the mother is a resident of this state after June 18, 1964; or

(3) When birth occurs out of this state and at some time following the birth the mother becomes a resident of this state after June 18, 1964.

One must acknowledge that reasonably construed, KRS 406.180 restricts the application of the chapter "to all cases of *birth out of wedlock.*" However, it is equally apparent that the legislative focus of KRS 406.180 is not upon the marital status of the biological parents involved. Instead, KRS 406.180 focuses on the *territorial* application of Kentucky's paternity law to assure that those who would invoke the laws and courts of Kentucky to adjudicate their paternity issues have a connection to this Commonwealth sufficient to warrant the use of its resources.

## V. "CHILD BORN OUT OF WEDLOCK" AND "BIRTH OUT OF WEDLOCK"

The Court of Appeals observed in *Montgomery v. McCracken*, 802 S.W.2d 943, 944 (Ky.App.1990),[22] that the phrase "a child

**18.** The argument originates in the *J.N.R.* lead opinion, 264 S.W.3d at 593–594.

**19.** Black's Law Dictionary 1402 (4th ed.1972).

**20.** It may be generally observed that the word "bastard" began to lose favor as it gained use as an epithet beyond its legal meaning. Similarly, "child born out of wedlock" seems to have gained favor over the term "illegitimate child" after the United States Supreme Court decision in *Levy v. Louisiana*, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968), struck down on equal protection grounds state law distinctions between "legitimate" children and "illegitimate" children.

**21.** By way of comparison, under Arkansas law, where a "putative father" also has standing to assert a paternity claim, the term is defined as "any man not legally presumed or adjudicated to be the biological father of the child, but who claims or is alleged to be the biological father of the child." *McAdams v. McAdams*, 353 Ark. 494, 109 S.W.3d 649, 653 (2003).

**22.** Because the ostensible overruling of *Montgomery* in the *J.N.R.* lead opinion, 264 S.W.3d at 592 (for its failure to conform to the view that KRS 406.011 provides subject matter jurisdiction of paternity actions) enjoyed the support of only two justices, we suggest that the red flag Key Cite reference to *Montgomery*

born out of wedlock" was not limited to the narrow constraints described in KRS 406.011. Having reviewed extensively Kentucky's bastardy and paternity statutes dating back to 1795, and the pertinent court decisions throughout the history of the Commonwealth, we cannot escape the conclusion that in our legal parlance, the terms "child born out of wedlock," "bastard," and "illegitimate child" have been used interchangeably throughout our jurisprudential history with no clear or concise differentiation between them. An "illegitimate child," a "bastard child" or a "child born out of wedlock" all refer to a child that is born to an unmarried mother or born to a married woman but fathered by a man other than the mother's husband. *See* 41 Am.Jur.2d 236, *Illegitimate Children* § 1 (2005); *see also* 14 C.J.S. *Children Out–of–Wedlock* § 1 (2011) ("The phrase 'born out of wedlock' refers to the status of parents of the child in relation to each other.")

■ Our experience in Kentucky jurisprudence is consistent with above cited treatises, and is confirmed by similar review by the courts of several other states. For example, in *Lewis v. Schneider,* 890 P.2d 148, 149–50 (Colo.Ct.App.1994), Colorado held:

> There are no Colorado cases that construe the terminology 'born out of wedlock' in the context of [Colorado's inheritance statutes]. Other jurisdictions have interpreted the phrase to refer both to a child born to an unmarried woman and also to one born to a married woman but having a father other than the mother's husband. *Estey v. Mawdsley,* 3 Conn.Cir.Ct. 491, 217 A.2d 493 (1966); *150 Wilkins v. Georgia Department of Human Resources,* 255 Ga. 230, 337 S.E.2d 20 (1985); *Johnson v. Studley–Preston,* 119 Idaho 1055, 812

P.2d 1216 (1991); *Pursley v. Hisch,* 119 Ind.App. 232, 85 N.E.2d 270 (1949); *Smith v. Robbins,* 91 Mich.App. 284, 283 N.W.2d 725 (1979); *Martin v. Lane,* 57 Misc.2d 4, 291 N.Y.S.2d 135 (N.Y.Fam. Ct.1968), rev'd sub nom. on other grounds, *Mannain v. Lay,* 33 A.D.2d 1024, 308 N.Y.S.2d 248 (1970), aff'd, 27 N.Y.2d 690, 314 N.Y.S.2d 9, 262 N.E.2d 216 (1970); *In re Legitimation of Locklear by Jones,* 314 N.C. 412, 334 S.E.2d 46 (1985); *State v. Coliton,* 73 N.D. 582, 17 N.W.2d 546 (1945).

We adopt this definition of 'born out of wedlock.'

■ To be sure, by statute or by common law, some states have concluded otherwise. But in the absence of a Kentucky statute specifically defining "birth out of wedlock" or "born out of wedlock" to the contrary, and in light of our common law experience with those terms, supported by the credible definition used among other states, we hold that a "birth out of wedlock" under KRS 406.180 occurs when a child is born to woman who, regardless of her marital status, was not lawfully married to the biological father at the time of the child's conception or at the time of the child's birth. The child born under such circumstance is a "child born out of wedlock." Upon application of this definition, N.R.S. is, if C.H.E. is indeed the father, "a child born out of wedlock." We also hold, under the facts before us, that KRS 406.021 affords C.H.E. standing to pursue a paternity claim as a "putative father." We need not now decide what factual allegations would provide reasonable grounds to vest one claiming to be the father of a married woman's baby with standing. It suffices here to state that based upon Appellant's admission that she had, at least

as being overruled greatly overstates its de-     mise as an authoritative precedent.

temporarily, a loving relationship with C.H.E. that included sexual intercourse during the likely time of conception, together with the apparent results of a DNA paternity test indicating his likelihood of paternity at 99.9429%, reasonable grounds exist to support C.H.E.'s claim to be the father of N.R.S., and therefore he qualifies as a putative father with standing to assert paternity.

## VI. CONCLUSION

This case arose as a writ petition under the first prong of the *Hoskins v. Maricle* standard—an allegation that the lower court was proceeding outside its subject matter jurisdiction. The allegations of C.H.E.'s pleadings are supported as a preliminary matter by evidence that satisfies the jurisdictional threshold of KRS Chapter 406 and vests him with standing as a "putative father" under KRS 406.021 with the right to plead and an opportunity to prove that he is the father of N.R.S. The trial court was, in the underlying action, acting within its subject matter jurisdiction, and therefore it properly denied Appellant's motion to dismiss.

Although we do so for the reasons set forth above rather than the reason's relied upon by the Court of Appeals, we affirm the Court of Appeals' denial of Appellant's Petition for a Writ of Prohibition.

ABRAMSON, NOBLE and SCHRODER, JJ., concur. MINTON, C.J., dissents by separate opinion. CUNNINGHAM, J., dissents by separate opinion in which SCOTT, J., joins.

MINTON, C.J., dissenting:

I compliment Justice Venters for his thoroughly researched and well-written majority opinion; but I cannot join it for the reasons expressed in my opinion in *J.N.R. v. O'Reilly*, 264 S.W.3d 587 (Ky. 2008).

The majority here adopts a definition of *born out of wedlock* that includes being "born to a married woman but having a father other than the woman's husband." The General Assembly could have adopted substantially the same definition by incorporating into KRS 406.011 the language proposed by the drafters of the Uniform Act on Paternity (1960): "[a] child born out of wedlock includes a child born to a married woman by a man other than her husband." But it chose not to; instead, it explicitly "includes" in KRS 406.011 "a child born to a married woman" as *a child born out of wedlock* only "where evidence shows that the marital relationship between the husband and wife ceased ten (10). months prior to the birth of the child." *See J.N.R.*, 264 S.W.3d at 590–91. And while use of the term *includes* might otherwise signal an illustrative rather than exhaustive term, I believe that the legislature's refusal to adopt the broad definition proposed by the Uniform Act on Paternity draft evinces a clear legislative intent contrary to the majority's interpretation.

Given that KRS 406.180 states that KRS Chapter 406 only applies to births "out of wedlock" and that the legislature chose not to adopt the definition of *born out of wedlock* that the majority adopts today, I do not agree with the majority that the trial court had subject matter jurisdiction simply because a paternity action was purportedly filed under KRS 406.021.

Perhaps changing mores and the advent of DNA testing call for a different approach than the one the legislature chose in decades past. If so, the legislature should undertake that broad policy debate. But I do not believe it is proper for this Court to amend the statutes by construing them in a manner contrary to the legislature's clear intent.

Thus, I respectfully dissent.

CUNNINGHAM, J., dissenting:

We vigorously dissent under the same banner for which we wrote in *J.N.R. v. O'Reilly*, 264 S.W.3d 587 (Ky.2008). In essence, we hold strongly that only partners to marriage have the standing to question the legitimacy of children born during their marriage. Interlopers cannot use their own adulterous behavior as a license to invade and disrupt the matrimonial circle. The majority here deals with only one child. We speak for the thousands of children yet unborn. For centuries, the institution of marriage has "been the rock in the shadow of which children are born, shaded, protected, and nurtured." *Id.* at 599 (Cunningham, J., concurring in result only). Our extended comments in the *J.N.R.* case will be left to speak for our refusal to stand quietly by as the legal institution of marriage is surrendered to the funeral pyre of modern convenience and unanchored values. We refuse to bow down to the "Gods of the Market–Place." RUDYARD KIPLING, THE GODS OF THE COPYBOOK HEADINGS (1919). Who is right and who is wrong in our debate will be left to the long view of history.

SCOTT, J., joins.