S.B., Appellant,

v.

M.C., Appellee.

No. 2009–CA–000966–ME.

Court of Appeals of Kentucky.

Sept. 23, 2011.

Stephanie Litteral, Georgetown, KY, for appellant.

William D. Tingley, Louisville, KY, for appellee.

Before CLAYTON, COMBS, and LAMBERT, Judges.

## OPINION

LAMBERT, Judge:

This matter originated in the Scott Family Court when S.B. filed a suit seeking to establish paternity of L.R.C., a minor child born to M.C. This suit was subsequently dismissed by the Scott Family Court for lack of subject matter jurisdiction. Because we believe the Scott Family Court had jurisdiction to determine paternity and custody, we reverse and remand for proceedings consistent with this opinion.

M.C. and C.C. were lawfully married on November 25, 1995, and remain married to date. They have two children together, not parties to this action, and M.C. has two other children born prior to her marriage to C.C. This case arises because M.C. acknowledges she had an affair with S.B. in 2005 and claims that S.B., and not her husband, C.C., is the biological father of L.R.C., born January 12, 2006.

From the time L.R.C. was born, M.C. has allowed and encouraged S.B. to be involved in L.R.C.'s life. S.B. has participated in the care, nurture, and support of L.R.C. and was contacted immediately upon L.R.C.'s birth so that he could visit and bond with his child at the hospital. S.B. immediately began supporting L.R.C. financially. When L.R.C. was brought home from the hospital, M.C. and C.C. allowed, and even facilitated, time-sharing with S.B. and his family at their home.

Initially after L.R.C.'s birth, S.B. visited the child at M.C.'s and C.C.'s home, due to L.R.C.'s infancy. As L.R.C. grew, S.B. wanted a more formal division of time-sharing with L.R.C. and, pursuant to the advice of counsel, filed a petition for paternity on March 3, 2006.

The petition for paternity was assigned case number 06–J–00049, and alleged that S.B. and M.C. had a physical relationship that began on January 13, 2005, and ended in June 2005. S.B. alleged that he had reason to believe he was L.R.C.'s father because M.C.'s husband, C.C., had had a vasectomy. Further, S.B. indicated that M.C. had acknowledged to him that he was L.R.C.'s father. On March 30, 2006, the Scott Family Court ordered the parties to go to the DNA Diagnostics Center within seven days or be held in contempt of court. While there is no mention in the court's orders of the results of the paternity testing, a diagnostic report dated April 6, 2006, is attached in the record to one of S.B.'s subsequent pleadings and confirms that S.B. is L.R.C.'s father by a probability of 99.9%.

M.C. filed two answers to S.B.'s petition for paternity. The first, dated April 7, 2006, denied all allegations and asked for attorney's fees. However, the second answer, dated April 12, 2006, admitted all the allegations in S.B.'s petition and stated that S.B. was L.R.C.'s father. The latter answer was filed by counsel M.C. utilized throughout the subsequent proceedings, and no amended answer was ever filed denying the allegations in S.B.'s paternity petition.

Nonetheless, despite her conflicting answers filed in the paternity case, on April 17, 2006, M.C. filed her own petition, this time stating that she and S.B. are the parents of L.R.C., and asking the court to establish custody. M.C. also asked that she be awarded child support and that the court establish time-sharing. This petition

was given a different case number, 06–CI–00213.

On July 19, 2006, S.B. also petitioned the court for temporary and permanent custody and support, asking that the court award joint custody and determine appropriate child support. In his affidavit in support of the petition, S.B. referred to the paternity test dated April 6, 2006, confirming that he is L.R.C.'s father.

On August 7, 2006, C.C., S.B. and M.C. signed a three-way paternity affidavit with the Commonwealth of Kentucky State Registrar of Vital Statistics, swearing that S.B. was the natural father of L.R.C. and that C.C. was not biologically related to L.R.C. On August 9, 2006, the family court entered an order establishing that there would not be overnight visitation because of L.R.C.'s age, but that the goal would be for S.B. to see L.R.C. for some period of time every forty-eight hours.

This arrangement appears to have continued until January 17, 2007, when S.B. petitioned the court for increased visitation. His affidavit in support of his motion stated that L.R.C. was then over a year old, and he believed L.R.C. was then of an age where overnight and extended time-sharing was appropriate. His affidavit further stated that the parties had attended mediation and had not reached an agreement on time-sharing. On February 28, 2007, the family court entered an agreed order designating that S.B. would have increased time-sharing during the week and weekends, and that S.B. would receive overnight time-sharing when L.R.C. reached eighteen months of age, or sooner if the child was no longer breast feeding.

In June 2007, S.B. again petitioned the court for increased time-sharing, since L.R.C. had reached eighteen months of age, and S.B. desired overnight visitation. On August 15, 2007, the family court entered an order under both case numbers 06–J–00049 and 06–CI–00213, increasing S.B.'s visitation to overnight time-sharing and establishing that S.B. would not drink alcohol while L.R.C. was in his care. In November, S.B. filed a motion requesting that the court grant holiday time-sharing and permission to maintain L.R.C.'s insurance and asking to receive the tax credit for L.R.C. These issues were addressed by the court in subsequent orders.

On January 23, 2008, new counsel for M.C. entered an appearance in the case. On March 26, 2008, M.C. filed a verified motion for permanent custody, asking the court that the parties be required to attend parenting classes, for appointment of a parenting coordinator, and for repayment of medical and child-related expenses. At this time, the parties attended mediation and agreed to share joint custody of L.R.C. A notice of submission was filed on June 10, 2008, tendering the mediation agreement to the court. On July 14, 2008, S.B. filed another motion to enter a final custody order incorporating the parties' mediation agreement, and the November 14, 2007, order was entered by the court.

On August 20, 2008, the court entered a handwritten order, which appears to address summer vacation and tax issues and requires the parties to brief the court on insurance issues. However, on August 22, 2008, the family court, *sua sponte,* entered an order stating that all previous orders were set aside temporarily until the court considered the constitutionality of the paternity statutes.

S.B. filed a memorandum in support of a custody determination on September 19, 2008, and attached numerous pictures of L.R.C. with his family and M.C.'s family, receipts for expenses he had paid since

L.R.C.'s birth, and the diagnostic report establishing paternity.

On September 25, 2008, M.C. tendered a notice of dismissal and a memorandum in support thereof, arguing that the court was without jurisdiction to determine custody in this case. In support of this argument, M.C. argued for the first time that she had always intended to raise L.R.C. as her husband's son, and that S.B. had badgered her to submit to paternity testing and filed the paternity action after L.R.C.'s birth. M.C. further argued that her prior counsel had filed an answer admitting the paternity of L.R.C. without her consent. M.C. argued that the family court did not have jurisdiction to hear the paternity case and, therefore, was without jurisdiction to establish custody.

In support of these arguments, M.C. contended that Kentucky Revised Statutes (KRS) 406.051 provides the district court with subject matter jurisdiction for children born "out of wedlock" and argued that, under KRS 406.011, L.R.C. was not born "out of wedlock" because he was born while she was married to her husband, despite M.C.'s having previously admitted to having an affair with S.B. for a six-month period and acknowledging that L.R.C. was S.B.'s child because her husband had had a vasectomy. M.C. argued that there was no proof in the record that she and C.C. had ceased having marital relations ten months prior to L.R.C.'s birth, and that absent any such evidence, S.B.'s paternity petition and any subsequent custody action was barred. M.C. further argued that S.B. had no standing to seek a determination of paternity or to seek custody or visitation, because there was no proof of cessation of marital relations.

S.B. filed a reply to M.C.'s memorandum on October 10, 2008; and on October 15, 2008, M.C. filed a motion to strike a letter dated April 18, 2006, from the record. This letter indicated that M.C. had attempted to have S.B.'s name placed on L.R.C.'s birth certificate, but that the hospital had not permitted her to do so because she was married to C.C. There is no ruling on this motion to strike contained in the record. On October 29, 2008, the attorney general's office filed a notice of its intent not to intervene in the current action.

Finally, on March 18, 2009, the family court issued an order denying S.B.'s motion for a custody order and granting M.C.'s motion to dismiss. The court determined that it was without subject matter jurisdiction to determine paternity and custody because KRS 406.180 limits jurisdiction to those children born "out of wedlock." The court further reasoned that C.C. had never agreed to paternity testing and, since there was no claim that M.C. and her husband were separated when L.R.C. was conceived, S.B. was an unwanted interloper under KRS 406.011 and *J.N.R. v. O'Reilly*, 264 S.W.3d 587 (Ky. 2008).

S.B. filed a Kentucky Rules of Civil Procedure (CR) motion to alter or amend, which was denied on May 11, 2009. This appeal now follows.

■ A judge is vested with vast discretion when it comes to exercising jurisdiction over a case, and as an appellate court we will not step in "unless there has been an abuse or a most unwise exercise thereof." *Couch v. Commonwealth*, 256 S.W.3d 7, 12 (Ky.2008) (quoting *Transit Authority of River City (TARC) v. Montgomery*, 836 S.W.2d 413, 416 (Ky.1992)). Kentucky family courts have been granted jurisdiction to handle all "[p]roceedings under the Uniform Act on Paternity, KRS Chapter 406." KRS 23A.100(2)(b).

Formerly, Kentucky courts were restricted by the definition of "out of wedlock" as defined in KRS 406.011. However, in the recent Kentucky Supreme Court case, *J.A.S. v. Bushelman*, 342 S.W.3d 850 (Ky.2011), the Court rejected the notion that KRS 406.011 defines the phrase "child born out of wedlock" and thereby controls the subject matter jurisdiction of paternity actions, and overruled the plurality opinion the trial court relied on in the instant case, *J.N.R. v. O'Reilly* 264 S.W.3d 587 (Ky.2008). *Id.* at 854. Instead, the court concluded that the statute's purpose is to "codify the traditional presumption of paternity as it has developed throughout our jurisprudence."

■ In *J.A.S.*, the mother of an out of wedlock child argued that KRS 406.011 defines " 'child born out of wedlock' to mean *exclusively* a child whose mother is unmarried or is a married woman whose marital relationship with her husband had ceased at least ten (10) months before the birth." *Id.* at 855. The mother further argued that, "since KRS 406.180 limits application of our paternity laws to 'births out of wedlock,' the Court has no jurisdiction to determine paternity of a child in all other circumstances." *Id.* The Supreme Court disagreed, and held that the statute does exactly what its heading portends: it abrogates the common law rule that a man has no legal obligation to support his illegitimate child and it codifies the traditional presumption of paternity. To be sure, the Court stated:

> KRS 406.011 determines not the cases over which our courts have subject matter jurisdiction, but the cases in which a man will be *presumed* to be the father of a child. It provides that the husband of a married woman is presumed to be the father of her child *only* if it was born while they were married or within ten months after the end of their "marital

relationship." It does not bar the claim that a man other than her husband may actually be the father. It simply provides that one challenging the legitimacy of a child born to a married mother within ten months after the cessation of her "marital relationship" cannot prevail without proof sufficient to overcome the presumption of paternity.

*Id.* at 855–56. (Emphasis in original).

In the instant case, the family court determined that there was no claim that M.C. and her husband were separated when the child was conceived. Thus, the presumption would be that C.C. was L.R.C.'s father. However, M.C. admitted that she had an affair with S.B. and, in her answer and her subsequent custody petition, also admitted that S.B. was L.R.C.'s biological father. M.C.'s judicial admissions, therefore, rebut the presumption that L.R.C. is C.C.'s biological child, and M.C. is estopped from now arguing that L.R.C. was born during lawful wedlock and that she intended to raise the child with her husband.

Furthermore, the diagnostic paternity test results are proof that S.B. is in fact L.R.C.'s father, and it appears that neither M.C. nor her husband ever challenged the result of the diagnostic tests, nor did they challenge the court's instructions to have the testing done. While the trial court focused on the fact that C.C. never authorized the paternity testing, the fact is that C.C. never *objected* to the paternity testing. In fact, he signed a sworn three-way parenting affidavit with the Registrar of Vital Statistics affirming that he was *not* L.R.C.'s father and that S.B. was the natural father of the child. It was not until the family court determined that it needed to evaluate the constitutionality of the paternity statutes in light of *J.N.R., supra,* that M.C. changed her mind and argued that she had always intended to raise L.R.C. as

her husband's child. However, her conduct showed otherwise.

In summation, given the fact that M.C. and C.C. judicially admitted that S.B. was L.R.C.'s father and the paternity testing confirmed that relationship, they are now estopped from arguing that the trial court had no jurisdiction to establish paternity and custody because S.B. did not allege in his initial petition that M.C. and C.C. were separated when L.R.C. was conceived. Any presumption that L.R.C. was born during lawful wedlock has been rebutted. Accordingly, the family court had jurisdiction to establish paternity and determine custody. Its holding to the contrary was in error.

For the foregoing reasons, we reverse the Scott Family Court's March 18, 2009, order dismissing this case for lack of subject matter jurisdiction and remand for a determination of paternity and custody consistent with this opinion.

ALL CONCUR.